STATE of Minnesota ex rel. Mary DOE et al., Appellants,

v.

Sister Mary MADONNA, General Director, St. Mary's Hospital et al., Respondents,

Honorable Melvin Peterson, Judge, Hennepin County Probate Court, Respondent.

STATE of Minnesota ex rel. Jane DOE et al., Appellants,

v.

Frank LARKIN, General Director, Metropolitan Medical Center et al., Defendants,

Honorable Melvin Peterson, Judge, Hennepin County Probate Court, Respondent.

STATE of Minnesota ex rel. Douglas A. VINGE, Appellant,

v.

Tom MATTISON, Director, Hennepin County Medical Center et al., Respondents.

Nos. 48751, 48766.

Supreme Court of Minnesota.

May 30, 1980.

William F. Messinger and John W. Elwell, Minneapolis, Beverly Balos, Legal Assistance of Ramsey County, of counsel, for appellants.

Gary W. Flakne, County Atty., George H. Elwell, Peter J. Fransway, and John J. Ryan III, Minneapolis, for Honorable Peterson and Mattison.

Rebecca Moos, Minneapolis, for Sister Mary Madonna.

Warren Spannaus, Atty. Gen., Paul G. Zerby, Asst. Atty. Gen., and Alan A. Held, Sp. Asst. Atty. Gen., St. Paul, for State.

Dayton, Herman, Graham & Getts and James A. Payne, Minneapolis, for Mental Health Assn. in Hennepin County.

KELLY, Justice.

These cases arise out of several orders (hold orders) pursuant to Minn.St. 253A.07, subd. 3, to confine individuals pending a determination as to whether the individuals should be committed to mental institutions. The facts of the individual cases are as follows:

*Mary Doe*

On October 7, 1977, a petition was filed in Hennepin County Probate Court for the commitment of Mary Doe due to mental illness. On October 11, a referee in probate issued a hold order, and she was taken to a hospital. On October 13, she left the hospital, and on October 14, another hold order was issued. She was returned to the hospital on October 18, and on October 20, the court continued the matter without a hearing until November 3. On October 24, she filed in the Hennepin County District Court a petition for a writ of habeas corpus, a class action complaint for declaratory judgment, a motion for class certification, and a motion to intervene in the John Doe case.[1] (The John Doe case was dismissed February 2, 1978.) At her commitment hearing on November 3, the commitment petition was dismissed, and Mary Doe was released. (Both her attorney and the opposing attorney concurred in a doctor's recommendation as to dismissal and as to her need for outpatient treatment.) Also on November 3, the juvenile court, under an emergency hold order, placed Mary Doe's children in foster care. On January 23, 1978, hospital defendants in Mary Doe's class action complaint filed a motion for dismissal of her complaint, and Mary Doe filed a motion for class certification and joinder with the Jane

---

1. The John Doe case was a class action similar to Jane and Mary Doe's. It was dismissed as moot at the district court level.

Doe case. On March 8, Judge Allen Oleisky denied the motions for class certification and joinder and dismissed the action. Mary Doe appeals from this decision.

*Jane Doe*

On October 17, 1977, a petition was filed to commit Jane Doe as mentally ill, and a hold order was issued by the Hennepin County Probate Court. The order was signed by a referee in probate. On October 27, Jane Doe filed a petition for writ of habeas corpus, a complaint for declaratory judgment, a motion for class certification, and a motion to join and intervene in the John Doe case in Hennepin County District Court. (The John Doe case was dismissed February 2, 1978.) On November 3 and 8, her commitment hearing took place in Hennepin County Probate Court. On November 8, she was released on condition that she enter a voluntary mental health program, and the hearing was continued for 60 days. On January 10, 1978, the commitment petition was dismissed in probate court.[2] On January 23, Jane Doe filed a motion in her district court action for class certification and joinder with Mary Doe. On March 8, District Court Judge Allen Oleisky denied the motions of Jane Doe and dismissed the action. Jane Doe appeals from this decision.

*Douglas A. Vinge*

On February 28, 1978, Douglas A. Vinge was subjected to a 72-hour emergency hospitalization in the Hennepin County Detoxification Receiving Center. On March 2, a petition for his commitment was filed, alleging him to be mentally ill and inebriate, and a hold order was issued by a referee in probate of the Hennepin County Probate Court. On March 6, Vinge filed a petition for a writ of habeas corpus in Minnesota Federal District Court and in Hennepin County District Court. On March 7, the Federal writ was denied due to failure to exhaust state remedies. On March 9, the district court denied his district court writ and held § 253A.07, subd. 3, constitutional. Douglas Vinge appeals from this denial.

On March 10, Douglas Vinge's commitment hearing was held in probate court. The mental illness allegation was dismissed and Vinge voluntarily entered a chemical dependency unit. On April 10, he was found not to be an inebriate by the probate court. This was conditioned on his voluntarily remaining in a chemical dependency unit.

In these appeals, appellants Jane Doe and Mary Doe contend that their actions should have been joined and certified as a class action under Rule 23, Rules of Civil Procedure; that their actions are not moot; and that § 253A.07, subd. 3, under which they were initially confined, is unconstitutional. Appellant Douglas Vinge also contends that his action is not moot and that § 253A.07, subd. 3, is unconstitutional. He also contends that the probate court referee does not have legal authority to issue hold orders. Because of our disposition of these issues, we affirm *Mary Doe v. Peterson* and *Jane Doe v. Peterson* and reverse *Vinge v. Mattison*. We do not find it necessary to reach other issues raised by the appellants.

I

■ Appellants Mary Doe and Jane Doe allege that they represent the class of "all persons who have been, now are, or may be apprehended, transported, admitted and/or confined to an institution or hospital as alleged mentally ill persons pursuant to § 253A.07(3)." Appellants filed a motion for certification as a class action on this basis. The motion was summarily denied by the Hennepin County District Court. Appellants contend that they meet the four class action requirements of Rule 23.01, Rules of Civil Procedure, as well as the requirement of Rule 23.02(3). Thus, they feel certification of a class action should have been granted. Respondent does not oppose appellants' contention that the case arises under Rule 23.02(3). See, *Hoehle v. Likins*, 538 F.2d 229, 231 (1976). Respon-

---

**2.** On January 27, 1978, another commitment petition was filed and another hold order was issued. On February 14, Jane Doe was committed to Anoka State Hospital. She was discharged from involuntary commitment on March 10.

dent argues, however, that appellants do not meet the four class action requirements of Rule 23.01: numerosity, commonality, typicality, and representativeness. Because we hold that the proposed class does not meet the requirement of representativeness, we need not consider the other requirements.

Respondents argue that not all members of the class would be in favor of this action and thus would not want the commitment procedure to be struck down. Thus, appellants would not fairly and accurately represent the interests of the class. Respondents cite *Nguyen Da Yen v. Kissinger*, 70 F.R.D. 656 (1976). In that case, a class action was commenced to reunite Vietnamese children in the United States with their biological parents in VietNam. The court recognized that the decision as to whether or not an individual child should be returned to VietNam was best made on an individual basis. "The individual interests of each child would, if plaintiffs' attorneys were allowed to represent all children, be dangerously 'buried in the catchall of the class action.'" 70 F.R.D. 666. We believe that a similar situation exists here. We agree with respondents that a potential conflict could exist between those individuals who would be subjected to an additional traumatic court action and the representatives of the class who foster such procedures.

## II

Appellants allege that their causes of action are not moot because:

(a) The action should have been certified as a class action, and the certification should "relate back" to prevent mootness;

(b) Appellants suffer collateral consequences resulting from the alleged denial of due process; and

**3.** Reliance on *Medynski v. Margolis*, 389 F.Supp. 743 (D.D.C.1975), for example, is misplaced because the majority opinion also confuses commitment with prehearing confinement.

(c) The actions complained of are capable of repetition, yet would evade judicial review.

(a) We have already concluded that this is not a proper case for a class action. See, I, *supra*. Thus, we need not consider the "relation-back" doctrine.

■ (b) Appellants also argue that the case is not moot due to collateral consequences which result from prehearing confinement. Respondents argue that legislative intent is to protect the rights of committed patients and prevent collateral consequences. This does not mean that collateral consequences should be ignored when they do occur, however, and thus, respondents' argument is irrelevant. Collateral consequences are presumed in a criminal case. *Pollard v. United States*, 352 U.S. 354, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957). Some courts will presume that collateral consequences exist where commitment has occurred. See, *Justin v. Jacobs*, 449 F.2d 1017, 1020 (D.D.C.Cir.1971).

Though they are attacking only prehearing confinement provisions, appellants' arguments as presented in their brief depend upon the collateral consequences of an actual commitment, not merely prehearing confinement.[3] But, in the present cases, only prehearing confinement has occurred. Though this is a major intrusion on the individual during the period of prehearing confinement, once release has occurred the possibility of collateral consequences may be minimal. Thus, we conclude that actual evidence of collateral consequences must be shown.

As to actual proof of collateral consequences resulting from the prehearing commitments, appellants offer no evidence concerning Jane Doe or Douglas Vinge. Mary Doe, however, was immediately served with a warrant, alleging negligence in the care of her children upon dismissal of the commitment petition.[4] In view of the allega-

**4.** The basis for the petition was as follows: "1. At Hennepin County Mentally Ill Commitment Hearing in Probate Court today, mother was not committed as mentally ill.

"2. Competent psychiatrist who is professionally familiar with mother's condition states

tions of the petition, however, we conclude that the petition was a collateral consequence of Mary Doe's own actions, not the result of the prehearing commitment. On the basis of collateral consequences, therefore, these cases would be moot.

■ (c) In contending that the cases are not moot because the actions complained of are capable of repetition, yet would evade judicial review, appellants point out that review of a hold order is not possible prior to its expiration; that over 1,000 individuals may be subject to hold orders in 1978 alone; that all appellants herein have a reasonable chance of again being subject to a hold order.

Respondents argue that this mootness exception does not apply because prehearing commitment procedures do not involve "* * * governmental action directly affecting, and continuing to affect, the behavior of citizens in our society." *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 126, 94 S.Ct. 1694, 1700, 40 L.Ed.2d 1, 10 (1974). Respondents' argument is without merit. Appellants were removed from society to hospitals where they were confined. When behavior is directly affected by governmental action, some method of review must exist. Respondents feel that review exists under this exception only if there is a chilling effect on actions which are "legitimate, natural and of a form basic to ideals of freedom." Freedom itself falls within this category, and freedom is what the appellants lost. Respondents apparently prejudge the actions of anyone committed to prehearing confinement in contending that actions that are often not illegal, only different, need not be protected. No one needs freedom to be the same as everyone else, but rather to be different. There is always the possibility that prehearing confinement, if not subject to review, could chill the rights of all of us.

Additionally, respondents argue that there must be some likelihood of repetition as to the particular plaintiff. This court in *Davis v. Davis*, 297 Minn. 187, 210 N.W.2d 221, n. 1 (1973), considered the constitutionality of the Minnesota requirement of 1-year residency prior to filing a complaint for divorce. In discussing mootness, this court did not state that a possibility of repetition as to the particular plaintiff was necessary even though the case was not a class action. See also, *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969) (complaint alleging unconstitutional refusal to certify electoral candidates not moot after election because procedure complained of remains and controls future elections). Further, it should be noted that Jane Doe has been the subject of an additional hold order since this litigation began.[5] This undercuts respondents' claim that repetition of the governmental action in this case is remote and speculative as to the particular appellants.

Because the actions which appellants attack, prehearing confinements, are capable of repetition, yet might evade review, we conclude that appellants' causes of action are not moot and proceed to the merits of the case.

### III

Under attack here are the procedures used in the probate court's confining of individuals prior to a commitment hearing[6] for the purposes of "observation, evaluation, diagnosis, emergency treatment, care,

---

children should not be returned to mother's care today.

"3. Previous to Probate Court hearing today, mother has stated that if anyone attempted to commit her as mentally ill or take her children, she would kill herself and her children.

"WHEREAS, IT APPEARS AN EMERGENCY EXISTS."

5. Jane Doe was the subject of three hold orders during the course of 1 year. Mary Doe has also been subject to more than one.

6. Emergency hospitalization when there is insufficient time to get a court order is provided under Minn.St. 253A.04. This provision is not under constitutional attack herein.

and if necessary, confinement." [7] Minn.St. 253A.07, subd. 3.

Appellants contend that they were deprived of their constitutional rights to liberty and due process of law because § 253A.07, on its face and as applied, fails to require a finding of dangerousness prior to confinement and fails to provide a probable cause hearing.

Section 253A.07 covers judicial commitment. It provides that any interested person may file a petition for commitment in the probate court giving the proposed patient's name and address, the name and address of the proposed patient's nearest relatives, and the reason for the petition.[8] The petition must be accompanied by either a statement by a physician stating that he has examined the proposed patient and is of the opinion that the proposed patient is mentally ill (or inebriate or deficient) and should be hospitalized or a statement by the petitioner that, after reasonable effort, he has been unable to have an examination performed. The court then appoints two examiners and provides for the examination. Section 253A.07, subd. 3, provides for a hold order as follows:

"The court may direct a health or peace officer or any other person to take the proposed patient into custody and transport him to a public hospital, private hospital consenting to receive him, public health facility, or other institution, for observation, evaluation, diagnosis, emergency treatment, care, and if necessary, confinement. The order of the court may be executed on any day and at any time thereof, by the use of all necessary means including the breaking open of any place in which the proposed patient is located and the imposition of necessary restraint upon the person of such proposed patient. Unless otherwise ordered by the court, a peace officer taking the proposed patient into custody pursuant to this subdivision shall not be in uniform and shall not use a motor vehicle visibly marked as a police vehicle."

Confinement continues until the commitment hearing occurs. The hearing may take place within 5 to 44 days as provided in § 253A.07, subd. 8:

"The court shall fix a time and place for the hearing which shall be held within 14 days from the date of the filing of the petition. For good cause shown, the court may extend the time of hearing up to an additional 30 days. When any proposed patient has not had a hearing on a petition filed for his commitment within 14 days from the date of filing of said petition, or within the extended time, the proceedings shall be dismissed. The proposed patient, or the head of a hospital or other institution in which the patient is held, may demand in writing at any time that the hearing be held immediately. Unless the hearing is thereafter held within five days of the date of such demand, exclusive of Saturdays, Sundays and legal holidays, the petition shall be automatically discharged if the patient is being held in a hospital or other institution pursuant to court order. For good cause shown, the court may extend the time of hearing on demand up to an additional 10 days.

■ Appellants argue that under the present statute a person is subjected to prehearing confinement without a finding of dangerousness. The parties herein apparently concede that a finding of "dangerousness" is necessary before an individual may be constitutionally committed under the Minnesota statute. *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45

---

**7.** Respondents note that individuals are confined only "if necessary." In this situation, the individual is involuntarily hospitalized in all cases. "Confined" apparently indicates that the individual is physically retrained from leaving, as by a locked ward.

**8.** Prior to filing, a copy of the petition must be submitted to the county welfare department.

The department may screen the petitions. Material submitted by the respondents shows that a complex, careful screening procedure is used in Hennepin County which corroborates the information on petitions where possible and explores all reasonable alternatives to commitment.

L.Ed.2d 396 (1975).[9] Respondents argue that the prehearing confinement order necessarily rests upon the definition of a mentally ill person, Minn.St. 253A.02, subd. 3,[10] which incorporates by reference the standard of proof and elements of dangerousness under Minn.St. 253A.07, subd. 17(a)(1).[11] Appellants, on the other hand, apparently believe that the functions of the probate court, prior to the commitment hearing, are purely ministerial and involve no judicial determination.

■ First, we note that at the precommitment stage only a finding of "probable dangerousness" can reasonably be required. In addition, we believe the statute intended that the probate court review the filed statements and make such a minimal deter-

mination in concluding that the filing requirements of § 253A.07, subd. 1, have been met.[12] We agree with the respondents that § 253A.07, subd. 17(a)(1) provides a description of the standard of dangerousness for mental illness as does § 253A.07, subd. 17(b)(1), for mental deficiency and § 253A.07, subd. 17(d)(1), does for inebriacy. In holding that the statute does mandate a judicial finding of probable dangerousness, we are strongly influenced by the general rule of construction that if different readings of a statute are possible, the statute should be construed so as to uphold its constitutionality, even though such construction is less natural. See, e. g., *Schumann v. Commissioner of Taxation*, 312

9. The United States Supreme Court attempted to leave this question open in *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), and a few courts have relied on this possibility. See, *Fhagen v. Miller*, 29 N.Y.2d 348, 328 N.Y.S.2d 393, 278 N.E.2d 615, certiorari denied, 409 U.S. 845, 93 S.Ct. 47, 34 L.Ed.2d 85 (1972). Most courts have rejected this possibility, however. See *Doremus v. Farrell*, 407 F.Supp. 509 (D.Neb.1975). See generally, Nowak, Rotunda and Young, Constitutional Law, p. 484, which states: "A significant number of people are also deprived of their freedom of action by being involuntarily committed to state institutions for mental treatment. While the Court has not clearly defined the procedures required, it is clear that an adult cannot be committed for a treatment of 'mental illness' unless there has been a fair procedure to determine that the person is dangerous to himself or others."

10. Minn.St. 253A.02, subd. 3, states: " 'Mentally ill person' means any person diagnosed as having a psychiatric or other disorder which substantially impairs his mental health and as being in need of treatment or supervision. For the purpose of involuntary commitment of a person as mentally ill, it is necessary for the court to find: (a) that the person is a mentally ill person, and (b) that involuntary hospitalization is necessary for the welfare of the person or the protection of society as defined in section 253A.07, subdivision 17, clause (a)."

11. Minn.St. 253A.07, subd. 17(a)(1), states: "If, upon completion of the hearing and consideration of the record which shall be made pursuant to the rules of evidence, the court finds the proposed patient is:

"(a) A mentally ill person, and (1) that the evidence of the proposed patient's conduct clearly shows that his customary self-control,

judgment, and discretion in the conduct of his affairs and social relations is lessened to such an extent that hospitalization is necessary for his own welfare or the protection of society; that is, that the evidence of his conduct clearly shows: (i) that he has attempted to or threatened to take his own life or attempted to seriously physically harm himself or others; or (ii) that he has failed to protect himself from exploitation from others; or (iii) that he has failed to care for his own needs for food, clothing, shelter, safety or medical care; and (2) after careful consideration of reasonable alternative dispositions, including but not limited to, dismissal of petition, out-patient care, informal or voluntary hospitalization in a private or public facility, appointment of a guardian, or release before commitment as provided for in section 253A.12, and finds no suitable alternative to involuntary hospitalization, the court shall commit such patient to a public hospital or a private hospital consenting to receive him, subject to a mandatory review by the head of the hospital within 60 days from the date of the order as hereinafter provided:"

Though the statute only states that the evidence must "clearly" show evidence of dangerousness, we believe it to be a reasonable interpretation that the statute intended a standard of proof higher than "preponderance of the evidence" for all aspects of the court's findings. Further, we interpret "clearly" as being equivalent to the "clear and convincing" standard sanctioned by the United States Supreme Court in *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

12. Obviously, the determination of probable dangerousness can be made on the basis of the statement of reasons for the petition or the doctor's statement, or both.

Minn. 477, 481–82, 253 N.W.2d 130, 132 (1977); *Minnesota Higher Education Facilities Authority v. Hawk*, 305 Minn. 97, 103, 232 N.W.2d 106, 110 (1975); Minn.St. 645.-17(3).

The information presented in the statement of reasons in the petition and/or the physician's statement on the cases under review clearly fulfills this standard of probable dangerousness under the guidelines in section 253A.07, subd. 17(a)(1). See note 11 *supra.* In the case of Mary Doe, the statement of reasons in the petition brought by her brother stated, among other things, that she had made repeated threats to kill herself, and detailed various activities that would indicate the existence of paranoid fantasies. The petition in the case of Jane Doe, brought by a Hennepin County welfare official, alleged that the patient was extremely depressed and had attacked a staff member with a knife. The physician's statement accompanying the petition diagnosed Jane Doe's psychiatric problem as uncontrolled seizures and schizophrenia. Finally, the petition in the case of Douglas Vinge, brought by his father, alleged, among other things, that the patient had cut his wrists while under the influence of drugs, and that, while driving under the influence of drugs, he had damaged at least five cars within a month after he had them, and had at least five traffic arrests. The evidence available to the reviewing officers in each case clearly warranted the preliminary determination that the patients were probably dangerous to themselves or to society. None of the appellants was actually committed to a mental institution as a result of the commitment hearing which followed the prehearing confinements attacked herein. This does not directly reflect on the probable cause necessary for prehearing confinement, however, and often results from a compromise wherein the proposed patient agrees to out-patient treatment as all three appellants did in these cases. In addition, it is possible that the treatment given during the short confinement of each of the patients involved in this appeal may have prepared them for their eventual release after the hearing.

More troublesome, however, is the language used by the reviewing officers in the hold orders in each case to express their finding of probable dangerousness. All of the hold orders stated:

"AND IT APPEARING that the best interest of said person, his (her) family and the public will be served by the immediate apprehension and observation of said person as hereinafter provided, IT IS ORDERED, that _____ take said person into custody * * *."

It does not necessarily follow from a determination that temporary confinement would be in the "best interests" of the patient, his family, and the public, that such confinement is necessary because the patient is probably dangerous to himself or society. Although the language of the orders may not technically reflect the finding of "probable dangerousness," we do not feel it necessary to reverse on this ground. Since a finding of probable dangerousness was required for the action taken, it can be considered to be an ultimate finding that can be inferred from the action taken. Cf. 2 K. Davis, Administrative Law Treatise § 16.07 (1958).

Appellants also argue that section 253A.07 does not provide for a probable cause [13] hearing within a reasonable period of time after prehearing confinement has begun. Amicus State of Minnesota argues that the full hearing serves the purpose of a preliminary hearing and occurs within a reasonable time. It is clear that involuntary commitment to a mental institution is a deprivation of liberty that a governmental entity cannot accomplish without due process of law. *O'Connor v. Donaldson*, 422 U.S. 563, 580, 95 S.Ct. 2486, 2490, 45 L.Ed.2d 396, 410 (1975) (Burger, C. J., concurring);

---

13. The question of "probable cause" in this context is whether sufficient reason exists to believe that a patient should be committed to a mental institution; for instance, whether reason exists to believe that the patient is probably dangerous to himself or others. It should not be confused with "probable cause" as used in the context of a criminal case.

*Stamus v. Leonhardt,* 414 F.Supp. 439, 445 (S.D.Iowa 1976). Although the state may have a compelling interest in temporary ex parte detention of persons dangerous to themselves or others, such detention is justified only for the amount of time necessary to prepare for a probable cause hearing before a neutral judge. See *Bell v. Wayne County General Hospital,* 384 F.Supp. 1085, 1097 (E.D.Mich.1974); *Lessard v. Schmidt,* 349 F.Supp. 1078, 1091 (E.D.Wis.1972), vacated and remanded on other grounds, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). There is no consensus in the courts as to the maximum time limits between initial confinement and a probable cause hearing that will not violate due process. Note, Civil Commitment of the Mentally Ill, 87 Harv.L. Rev. 1190, 1276. The tendency, however, has been to shorten the delay before a preliminary hearing, *id.* at 1277–79, and, for example, certain courts have suggested that the maximum delay is 96–120 hours, *Wessell v. Pryor,* 461 F.Supp. 1144, 1145 (E.D. Ark.1978), or even as limited a period as 48 hours. *Lessard v. Schmidt,* 349 F.Supp. at 1091. In line with recent cases on the subject, we feel that due process compels a preliminary probable cause hearing at least within 72 hours of initial confinement under

a hold order, unless the court extends the time for such a hearing on the basis of evidence demonstrating that a hearing within this period of time would have a serious adverse effect on the well-being of the confined patient, or that other emergency conditions justifying a continuance exist.[14] Since none of the appellants received such a hearing or its equivalent promptly enough, and no evidence justifying a continuance was presented, the statute has been unconstitutionally applied as to them, and their cases must be reversed.

This holding does not necessarily require that the statute be held facially unconstitutional, because the language of the statute does not prevent its implementation in accordance with acceptable constitutional standards.[15] See *Wessell v. Pryor,* 461 F.Supp. 1144, 1146 (E.D.Ark.1978). The statute does not exclude the possibility of a preliminary probable cause hearing, but merely makes no reference to it.[16]

 Our holding simply means that in order for the statute to operate constitutionally in the future a preliminary probable cause hearing must be held within 72 hours after confinement, unless continued under the grounds listed above.[17] Such a

**14.** Mere convenience of attorneys or witnesses, for example, would certainly not constitute such emergency conditions. If the hearing is continued, the postponement should be no longer than to accommodate the interests of the person confined.

**15.** In fact, the current statutory scheme could be applied consistently with constitutional requirements. Section 253A.07, subd. 8, mandates that a full commitment hearing be held *within* 14 days from the date of the filing of the petition, or *within* 5 days after a patient's demand for a full hearing. It is thus apparent that the statute could operate constitutionally if the full hearing, combining within itself the function of a preliminary hearing, were held 72 hours or fewer after the initial confinement.

**16.** The author of this opinion believes that the existence of the legislatively authorized relief of habeas corpus is consistent with the existence of a preliminary probable cause hearing in confinement cases. A petition for habeas corpus could be heard within 12 to 48 hours of the initial confinement. In fact, in the *Vinge* case, a hearing took place within 48 hours of appellant's filing such a petition. Habeas corpus

alone, however, may not save the statutory procedure from constitutional objections, since it puts the burden of obtaining the hearing on the patient, and perhaps also the burden of going forward with the evidence. This burden would be slight, merely a showing that no probable cause hearing had been held within a reasonable period of time.

**17.** Other courts, in holding similar statutory procedures unconstitutional, have *impliedly* authorized such hearings by requiring that future involuntary commitments comport with the requirements of due process. See, e. g., *Kendall v. True,* 391 F.Supp. 413, 419 (W.D.Ky.1975) (although holding that the Kentucky statute was deficient in not requiring a probable cause hearing, the court stated, "we point out that our holding does not do away with the state's right to commit persons who are dangerous, either to themselves or to society"); *Lynch v. Baxley,* 386 F.Supp. 378, 397 (M.D.Ala.1974) ("all future involuntary commitments to any of Alabama's mental institutions [must] fully comport with the requirements of procedural and substantive due process"). We therefore authorize a preliminary probable cause hearing

hearing need not be as formal as a full commitment hearing. However, the hearing should be preceded by an adequate notice informing the proposed patient of the grounds for such confinement, and the patient should have the opportunity to be represented by counsel, either retained or appointed.[18] See, e. g. *Stamus v. Leonhardt*, 414 F.Supp. 439, 446 (S.D.Iowa 1976); *Lynch v. Baxley*, 386 F.Supp. 378, 388–9 (M.D.Ala.1974); *Bell v. Wayne County General Hospital*, 384 F.Supp. 1085, 1098 (E.D. Mich.1974). The probable cause hearing may properly include the receiving of doctor's reports as hearsay. See *Kendall v. True*, 391 F.Supp. 413, 419 (W.D.Ky.1975). It may also consist of the commitment hearing or of a bifurcated portion of the commitment hearing.

We reiterate that these requirements are only the minimum standards that we believe are mandated by due process, and they are meant to function as interim measures until the Minnesota Legislature acts.[19] The legislature may in fact decide that a preliminary hearing should be held within a shorter time than that required by this decision.

### IV

Appellant Vinge contended in his habeas corpus proceeding that a Hennepin County Probate Court referee does not have authority to issue a prehearing confinement order.[20] The probate court referee procedure is based upon Minn.St. 525.10 to 525.103. Minn.St. 525.102 states:

" * * * [T]he judge by order may refer to the referee any matter, cause, or

proceeding pending in such court. In all matters so referred the referee shall find the facts and report the findings to the judge. In all matters referred and reported the referee may append his signature to the order or decree of the court; and whenever his signature shall be so appended, it shall constitute conclusive evidence that the matter was referred, heard, and reported in the manner required by law and the order of the court therein, provided that the failure of the referee to append his signature to any such order or decree shall not affect its validity."

There is no express requirement that the probate judge confirm the referee's findings or make an independent decision, but neither is there a statement that a referee can issue orders. Appellant argues that the referee only has the power to find facts and report findings (as well as taking acknowledgments and administering oaths, Minn.St. 525.10), not to issue orders. Respondents argue that the power to sign orders is the power to issue orders. Yet, the statute only states that the referee's signature on an order of the court constitutes conclusive evidence that the matter was taken care of as required by law and by the order of the referring judge. The referee's signature does not affect validity; it only evidences that the matter was correctly handled in the referee procedure. Thus, nothing in the pertinent statute gives the referee power to issue orders—only to find facts and report the findings.

under our inherent supervisory power to control procedures in the trial courts as an interim measure to remain in force until the legislature acts.

**18.** See Minn.St. § 253A.07, subd. 15, which requires the court, at the time the examiners are appointed, to appoint counsel to represent the proposed patient "if neither the proposed patient nor others provide counsel". In order for there to be effective assistance of counsel at the probable cause hearing, counsel should be appointed at the time the hold orders are issued to allow them time to prepare. In the cases under review, counsel were in fact appointed at the time the hold orders were issued.

**19.** In this connection, we recommend to the legislature's attention the recently published *Final Report of the Supreme Court Study Commission on the Mentally Disabled and the Courts*.

**20.** The probate court referee also issued the prehearing confinement orders in the cases of appellants Mary Doe and Jane Doe. Since appellant Vinge is the only one who has raised this issue, both below and at the appellate level, however, we will consider the question only in the context of his case.

Prior law in this area gave the referee powers coequal with the probate judge. L. 1929, c. 271, § 5, stated:

"In all matters so referred to him *the referee in probate shall have all the powers of the judge of said court.* Trials and hearings by the referee in probate shall be conducted in the same manner and upon like notice as trials and hearings by the court. His rulings and decisions may be reviewed in the same manner and not otherwise as the rulings and decisions of the court. The decision of the referee in the trial and determinations of the whole cause or any issue shall stand as the decision of the court and *the orders, decrees, citations and other process signed in the name of such court by the referee shall stand as the orders, decrees, citations, and/or other process of the court.*" (Italics supplied.)

The powers of the referee were expressly limited in subsequent law, however. L. 1931, c. 302, § 2, revised the law to read:

"In all matters so referred to him the referee shall find the facts and report the same to the judge of said court. *The said referee shall have no power to decide any of the issues involved in the matter so referred to him but shall hear the evidence and report the facts thereof to the judge who shall decide the issue.*" (Italics supplied.)

Later revisions eliminated the language expressly denying the referee powers. See, L. 1935, c. 72, § 18. But the referee has never expressly been returned the power to issue orders. See, Minn.St. 525.102, *supra.*

We conclude that it is the duty of the judge to make conclusions of law based on the referee's findings of fact. If the judge then issues a commitment order, the referee *may* sign it, and, if he does, this conclusively evidences that the matter was referred to the referee and was heard and reported in the manner required by law and in the manner required by the referring order of the judge.

Reversed.

TODD, J., took no part in the consideration or decision of this case.