Lanny ENBERG, Appellant,

v.

John R. BONDE, etc., et al.,
Respondents.

No. CX–81–789.

Supreme Court of Minnesota.

March 18, 1983.

Linda Ojala, MCLU, Gray, Plant, Mooty, Mooty & Bennett and Susan L. Lentz, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., and Paul G. Zerby, Asst. Atty. Gen., Minneapolis, for respondents.

Robert M. Levy, New York City, Lisbeth Nudell, St. Paul, for Mental Health Ass'n of Minnesota and American Orthopsychiatric Ass'n.

Onek, Klein & Farr, Joel I. Klein and JoAnn E. MacBeth, Washington, D.C., for The Minnesota Psychiatric Society.

YETKA, Justice.

Plaintiff Lanny Enberg sought damages and injunctive and declaratory relief as a result of his involuntary detention at Brainerd State Hospital under Minn.Stat. § 253A.04, subd. 1 (1980).[1] The trial court denied that relief. Plaintiff appeals, claiming the statute is unconstitutional in that it does not require evidence of an overt act, attempt or threat of harm to self or others prior to emergency hospitalization and also does not require a preliminary hearing within 72 hours of initial detention. We find that plaintiff's first claim has been mooted by the adoption of Minn.Stat. ch. 253B (1982) and that his second claim is incorrect; consequently, we affirm.

Plaintiff commenced an action in 1977, with an amended complaint filed in September 1979. The complaint sought damages and injunctive and declaratory relief "pursuant to 42 U.S.C. 1983, the Fourteenth Amendment to the United States Constitution, and Article 1, Sections 7 and 8 of the Constitution of the State of Minnesota, and Minnesota common law."[2] The action arose out of plaintiff-appellant Enberg's detention at Brainerd State Hospital under Minn.Stat. § 253A.04 (1980), providing for the emergency hospitalization of mentally ill and mentally deficient persons. Appellant sued Dr. John R. Bonde, individually and as Director of Psychiatric Services; Dr. Leonard T. Fielding, individually and as Director of Medical Services; Vera J. Likins and Edward J. Dirkswager in their official capacities as Commissioners of the Department of Public Welfare and their successors in interest; and the State of Minnesota.

By order of August 4, 1980, as amended by order of September 4, 1980, the Crow Wing County District Court partially granted the summary judgment motion on behalf of defendants Likins and Dirkswager in their official capacity as Commissioners of the Department of Public Welfare and on behalf of the State of Minnesota, finding in their favor only on the issue of immunity from money damages. The summary judgment motion of Drs. Bonde and Fielding, individually, was denied.

The case was tried to a jury in May 1981. The jury was asked questions on special verdict. They found that:

(a) Dr. Bonde had sufficient medical evidence to determine that appellant should have been hospitalized under Minn.Stat. § 253A.04, subd. 1 (1980);

(b) Dr. Bonde had reason to believe that appellant had committed, attempted or threatened a recent overt act of harm to himself or others;

---

1. The statutory scheme applicable to this case, Hospital and Commitment Act, Minn.Stat. §§ 253A.01–.23 (1980), was repealed in its entirety in 1982, Act of Mar. 22, 1982, ch. 581, § 25, 1982 Minn.Laws 1329, 1358–59, and replaced by the Minnesota Commitment Act of 1982, Minn.Stat. §§ 253B.01–.23 (1982).

2. In fact, the case was actually tried, and is here on appeal, as an action under 42 U.S.C. § 1983 (Supp. IV 1980).

(c) appellant suffered no compensable damages; and

(d) Dr. Fielding had acted in good faith, believed his actions were proper, and had reasonable grounds for belief that his actions were proper.

After the special verdict, plaintiff moved for declaratory and injunctive relief, for special findings of fact and conclusions of law, for judgment NOV or, in the alternative, a new trial. The district court denied all motions in an order dated June 16, 1981. Plaintiff Enberg appealed. We affirm.

On January 2, 1976, Lanny Enberg went to Brainerd State Hospital. His purpose in going there was twofold: first to visit a friend in the chemical dependency unit (located in Building 22); second, to talk with someone about his own concerns. Appellant felt depressed and had been thinking about his father's suicide, which had occurred within the preceding year.

At the hospital, appellant spoke for several minutes with a member of the staff. He then spoke with Dr. Elizabeth Brody, a clinical psychologist at the hospital. Appellant spoke with Dr. Brody for about 20 minutes. He said that his friends thought that he was weird. He talked about his father's suicide. According to Dr. Brody's testimony at trial, Enberg was often incoherent, his speech was disjointed, and he used half sentences. Dr. Brody also testified that appellant appeared to be extremely agitated and kept looking suspiciously around the room.

After this conversation, Dr. Brody went to Dr. John R. Bonde, a staff psychiatrist and later chief of psychiatric services, Building 22, where Enberg was detained. Dr. Brody asked Dr. Bonde to talk with appellant.

Appellant told Dr. Bonde of certain premonitions he had had, including a premonition of his father's death and a vision of the Statue of Liberty with cracks all over it. He told Dr. Bonde that, at a party a few days before, he had drunk some wine, smoked marijuana, and perhaps had smoked some hashish as well. According to Dr. Bonde, appellant related an incident where he had been involved in a verbal altercation with a "redneck" and began to have thoughts of going out of control and kicking the man in the scrotum. Dr. Bonde also observed that appellant often glanced over his shoulder as if suspicious of something. At times, appellant would become angry. Appellant wore a jacket with a cobra on the back and took it off in order to show Dr. Bonde the snake, telling him it had to do with "protecting the heart when he was harassed by people."

After this discussion, which lasted roughly 10 minutes, Dr. Bonde decided to hospitalize appellant. Despite appellant's assertions to the contrary, there is evidence that, before hospitalizing Enberg, Dr. Bonde suggested the alternative of treatment at the Northern Pines Health Clinic; Enberg declined.

Much testimony at trial dealt with events subsequent to the decision to hold Enberg. Respondents brought out evidence of threats and other irrational behavior by appellant while appellant elicited testimony that he had never attempted or committed an overt harmful act. Appellant attempted to prove he had received no formal treatment, while respondents sought to show that Enberg refused attempts at treatment and benefited substantially merely from being hospitalized. Although such evidence might show that Dr. Bonde's decision that Enberg needed hospitalization and Dr. Fielding's consent to hospitalization had some merit, it is not relevant to the issues in this case; namely, whether Dr. Bonde had reason to hospitalize Enberg at the time he did so and whether Enberg should have had a preliminary hearing within 72 hours.

Within 72 hours after Enberg entered the hospital, his mother filed a petition for judicial commitment. The petition was accompanied by a written statement from Dr. Bonde. Before a hearing could be held pursuant to Minn.Stat. § 253A.07 (1980), it was determined that appellant Enberg had improved enough to be released. Enberg left Brainerd State Hospital on January 20, 1976.

This appeal raises the following issues:

1. Are respondents Bonde and Fielding immune from liability?

2. Does due process require evidence of a recent overt act, attempt or threat to do harm to self or others before an individual may be involuntarily confined on an emergency basis?

3. Does due process require a preliminary hearing of some kind within 72 hours of confinement under the emergency hospitalization statute?

■ 1. A threshold issue is whether the respondents here are immune from liability. All defendants except for Dr. Bonde and Dr. Fielding were granted immunity from damages by summary judgment and that disposition is not being challenged on appeal.

Minn.Stat. § 253A.04, subd. 1 (1980) provided that:

Subdivision 1. Any person may be admitted or held for emergency care and treatment in a hospital with the consent of the head of the hospital upon a written statement by any licensed physician that he has examined the person not more than 15 days prior to the person's admission, that he is of the opinion, for stated reasons, that the person is mentally ill, inebriate or mentally deficient and is in imminent danger of causing injury to himself or others if not immediately restrained, and that an order of the court cannot be obtained in time to prevent such anticipated injury. Such physician's statement shall be sufficient authority for a peace or health officer to transport a patient to a hospital.

A later section of the same chapter granted a qualified immunity to those acting under the statute:

All persons acting in good faith, upon either actual knowledge or information thought by them to be reliable, who act pursuant to any provisions of this chapter or who procedurally or physically assist in the hospitalization of any individual, pursuant to sections 253A.01 to 253A.21, are not subject to any civil or criminal liability under sections 253A.01 to 253A.21.

Minn.Stat. § 253A.21, subd. 2 (1980).

In answering the special verdict questions before it,[3] the jury here determined that

---

3. The jury was given the following interrogatories and answered them as indicated:

"QUESTION NO. 1
"On January 2, 1976, prior to the issuance of the hold order, did defendant Bonde have sufficient clinical medical information based upon medically accepted professional judgment, practice and standards upon which to base a reasonable medical diagnosis that plaintiff Enberg was mentally ill and in imminent danger of causing injury to himself or others and a court order could not be obtained to prevent such anticipated injury?
"ANSWER: (Yes or No) /s/ Yes.
"QUESTION NO. 2
"On January 2, 1976 prior to the issuance of the hold order, did defendant Fielding have sufficient clinical medical information based upon medically accepted professional judgment, practice and standards upon which to base a reasonable medical diagnosis that plaintiff Enberg was mentally ill and in imminent danger of causing injury to himself or others and a court order could not be obtained to prevent such anticipated injury?
"ANSWER: (Yes or No) /s/ No.
"QUESTION NO. 3
"Prior to the hold order on January 2, 1976, did defendant Bonde have reason to believe that plaintiff Enberg committed, attempted or threatened a recent overt act of harm to himself or others?
"ANSWER: (Yes or No) /s/ Yes.
"QUESTION NO. 4
"Prior to the hold order on January 2, 1976, did defendant Fielding have reason to believe that plaintiff Enberg had committed, attempted or threatened a recent overt act of harm to himself or others?
"ANSWER: (Yes or No) /s/ No.
"QUESTION NO. 5
"INSTRUCTION: Answer the following questions 5, 6, 7 and 8 only if you have answered "No" to any of questions No. 1, 2, 3 and 4. Do not answer questions 5, 6, 7 and 8 if your answers to questions No. 1, 2, 3 and 4 was [sic] yes.
"5. Were the actions of defendant Bonde a direct cause of plaintiff Enberg's confinement in the State Hospital from January 2nd to January 7th, 1976?
"ANSWER: (Yes or No) /s/ Yes.
"QUESTION NO. 6
"Were the actions of defendant Bonde a direct cause of plaintiff Enberg's confinement in the State Hospital from January 7th through January 20th, 1976?
"ANSWER: (Yes or No) /s/ Yes.
"QUESTION NO. 7

defendant Fielding acted in good faith, believing that his actions were proper. The jury also found that there were reasonable grounds for Fielding's belief that his actions were proper. The jurors did not consider the application of the immunity defense to defendant Bonde since they had already found that Bonde had sufficient clinical medical information to satisfy the requirements set out in Minn.Stat. § 253A.04, subd. 1 (1980) *and* that he had reason to believe that plaintiff Enberg had committed, attempted or threatened a recent overt act of harm to himself or others. A thorough examination of the record reveals no reason for overturning these jury findings. Appellant argues that the court should have found as a matter of law that defendants did not act in good faith. We cannot agree. The study of case law indicates that the trial court's instructions and handling of this case were in complete conformity with present law on the subject and that the matters presented to the jury were proper jury questions. Consequently, the respondents are entitled to immunity under state statute.

▌ We must still decide whether respondents are entitled to good faith immunity under 42 U.S.C. § 1983. In *O'Connor*

*v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), the United States Supreme Court was faced with an argument that the superintendent of a state mental hospital had unconstitutionally deprived the plaintiff of his constitutional right to liberty by keeping him confined at the hospital. The superintendent claimed good faith immunity. The Court remanded the case, leaving the finding of immunity *vel non* to a jury. The Court stated that:

> [T]he relevant question for the jury is whether [the superintendent] "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of [the patient], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to [the patient]."

*Id.* at 577, 95 S.Ct. at 2494, *citing Wood v. Strickland,* 420 U.S. 308, 330, 95 S.Ct. 992, 1005, 43 L.Ed.2d 214 (Powell, J., concurring in part and dissenting in part), *reh'g denied,* 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975). The Court noted that "an official has, of course, no duty to anticipate unforeseeable constitutional developments." *Id.*

"Were the actions of defendant Fielding a direct cause of plaintiff Enberg's confinement in the State Hospital from January 2nd to January 7th, 1976?
"ANSWER: (Yes or No) /s/ Yes.
        "QUESTION NO. 8
"Were the actions of defendant Fielding a direct cause of plaintiff Enberg's confinement in the State Hospital from January 7th through January 20th, 1976?
"ANSWER: (Yes or No) /s/ Yes.
        "QUESTION NO. 9
"What amount of money as an award of damages would fairly and reasonably compensate plaintiff Enberg for the elements of damage plaintiff Enberg suffered as a result of his confinement in the Brainerd State Hospital from January 2nd through January 7th, 1976?
"ANSWER: $ /s/ -0-.
        "QUESTION NO. 10
"What amount of money as an award of damages would fairly and reasonably compensate plaintiff Enberg for the elements of damage plaintiff Enberg suffered as a result of his confinement in the Brainerd State Hospital from January 7th through January 20th, 1976?

"ANSWER: $ /s/ -0-.
        "QUESTION NO. 11
"With respect to the immunity defenses, answer question 11a, b and c only if you have answered "no" to either question 1 and 3.
"11a Did defendant Bonde act in good faith? ANSWER: (Yes or No) /s/ ___.
"11b Did defendant Bonde believe that his actions were proper? ANSWER: (Yes or No) /s/ ___.
"11c If so, were there reasonable grounds for defendant Bonde's belief that his actions were proper? ANSWER: (Yes or No) /s/ ___.
        "QUESTION NO. 12
"With respect to the immunity defenses, answer question 12a, b and c only if you have answered "no" to either question 2 or 4.
"12a Did defendant Fielding act in good faith? ANSWER: (Yes or No) /s/ Yes.
"12b Did defendant Fielding believe that his actions were proper? ANSWER: (Yes or No) /s/ Yes.
"12c If so, were there reasonable grounds for defendant Fielding's belief that his actions were proper? ANSWER: (Yes or No) /s/ Yes."

In *Sebastian v. United States,* 531 F.2d 900 (8th Cir.), *cert. denied,* 429 U.S. 856, 97 S.Ct. 153, 50 L.Ed.2d 133 (1976), the Court held that a psychiatrist who examined appellant pursuant to a petition filed in an Arkansas probate court and hospitalized him for further evaluation was entitled to good faith immunity. *Id.* at 903–04; *accord Gross v. Pomerleau,* 465 F.Supp. 1167 (D.Md.1979) (medical personnel who examined plaintiff under emergency commitment procedures entitled to good faith immunity where they had no reason to believe procedures deprived plaintiff of her constitutional rights and there was no evidence personnel behaved arbitrarily, recklessly, or maliciously so as to deprive plaintiff of her constitutional rights).

This court has addressed the physician's good faith immunity issue in a slightly different context. In *Price v. Sheppard,* 307 Minn. 250, 239 N.W.2d 905 (1976), the Director of the Minnesota Security Hospital had administered electroshock therapy to a patient against the express wishes of the patient's guardian. The court, relying on the language just quoted from *O'Connor v. Donaldson,* found the director immune from an action for damages for acts performed by him in good faith and which he could not reasonably have known would violate the constitutional rights of another. 307 Minn. at 260–62, 239 N.W.2d at 912.

In the present case, both Dr. Bonde and Dr. Fielding were state employees. Appellant does not argue that persons in respondents' position are not protected by good faith immunity, but claims that respondents did not act in good faith. As already noted, the jury found otherwise. It would appear that respondents are immune from liability under 42 U.S.C. § 1983.

Respondents' immunity significantly affects our resolution of this appeal. Even if it is decided that appellant's due process rights were violated, there is presently no one from whom he may collect damages. All that remains are appellant's prayers for injunctive and declaratory relief. Under the recently enacted Minnesota Commitment Act of 1982, Minn.Stat.

§§ 253B.01–.23 (1982), the requirement of a recent overt act, attempt or threat of harm to self or others has been incorporated into the emergency hospitalization (now described as emergency hold) procedure.

■ 2. The next issue raised is whether due process requires evidence of a recent overt act, attempt or threat to do harm to self or others before an individual may be involuntarily confined on an emergency basis. Minn.Stat. § 253A.04, subd. 1 (1980) requires that, in order for a person to be admitted or held for emergency care, an examining physician conclude "that the person is mentally ill, inebriate or mentally deficient and is in imminent danger of causing injury to himself or others if not immediately restrained." Appellant argues that this requirement offers insufficient protection to persons being evaluated for admission or detention under the statute. Appellant relies in part on *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). There, the United States Supreme Court stated:

This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. See, *e.g., Jackson v. Indiana,* 406 U.S. 715 [92 S.Ct. 1845, 32 L.Ed.2d 435] (1972); *Humphrey v. Cady,* 405 U.S. 504 [92 S.Ct. 1048, 31 L.Ed.2d 394] (1972); *In re Gault,* 387 U.S. 1 [87 S.Ct. 1428, 18 L.Ed.2d 527] (1967); *Specht v. Patterson,* 386 U.S. 605 [87 S.Ct. 1209, 18 L.Ed.2d 326] (1967). Moreover, it is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomena "stigma" or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual.

*Id.* 441 U.S. at 425–26, 99 S.Ct. at 1808–09. In order to protect this liberty interest, appellant maintains that it is necessary to provide a more rigorous standard for com-

mitment: evidence of a recent overt act, attempt or threat of harm to self or others. Appellant contends that, without this added requirement, it is impossible to predict dangerousness with sufficient accuracy to justify the deprivation of liberty inherent in involuntary commitment.

This court recently recognized the problems involved in predicting dangerousness, noting that "[m]any psychiatrists themselves admit that their ability to predict future dangerousness is not reliable; to date, no valid clinical experience or statistical evidence reliably describes psychological or physical signs or symptoms that can be reliably used to discriminate between the harmless and the potentially dangerous individual." *Johnson v. Noot,* 323 N.W.2d 724, 728 (Minn.1982).

Both sides here presented considerable expert testimony at trial as to whether it is necessary to adopt the overt act, attempt or threat requirement in order to bring predictions of dangerousness up to an acceptable level of accuracy. Persuasive evidence for and against the requirement was presented at trial and compelling arguments for each position were laid out in amicus briefs from several mental health and psychiatric associations. Supporters of the requirement argue that, without it, many people will be wrongly confined as dangerous. Opponents respond that the test adds little reliability to psychiatrists' predictions and prevents the confinement of individuals who are clearly dangerous but have yet to undertake an overt act, attempt or threat of harm.

A good review of the cases in this area is presented in Note, *Overt Dangerous Behavior as a Constitutional Requirement for Involuntary Civil Commitment of the Mentally Ill,* 44 U.Chi.L.Rev. 562 (1977). In light of the conflicting views of the experts and the courts on this matter, we agree with the author of this Note that, while the recent overt act, attempt or threat requirement may be good policy, it is not necessarily a constitutional mandate. *Id.* at 592–93.

In any event, the Minnesota Legislature has, in fact, adopted this requirement.

Minn.Stat. § 253B.05, subd. 1 (1982) provides:

**EMERGENCY HOLD.** Any person may be admitted or held for emergency care and treatment in a treatment facility with the consent of the head of the treatment facility upon a written statement by an examiner that: (1) he has examined the person not more than 15 days prior to admission, (2) he is of the opinion, for stated reasons, that the person is mentally ill, mentally retarded or chemically dependent, and is in imminent danger of causing injury to himself or others if not immediately restrained, and (3) an order of the court cannot be obtained in time to prevent the anticipated injury.

The statement shall be: (1) sufficient authority for a peace or health officer to transport a patient to a treatment facility, (2) stated in behavioral terms and not in conclusory language, and (3) of sufficient specificity to provide an adequate record for review. A copy of the statement shall be personally served on the person immediately upon admission. A copy of the statement shall be maintained by the treatment facility.

Although the standard here seems, at first glance, identical to that in Minn.Stat. § 253A.04, subd. 1 (1980), the new requirement has been incorporated into the definition of mental illness, which now reads as follows:

**MENTALLY ILL PERSON.** "Mentally ill person" means any person who has a substantial psychiatric disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand, which (a) is manifested by instances of grossly disturbed behavior or faulty perceptions; and (b) poses a substantial likelihood of physical harm to himself or others as demonstrated by (i) a recent attempt or threat to physically harm himself or others, or (ii) a failure to provide necessary food, clothing, shelter or medical care for himself, as a result of the impairment.

This impairment excludes (a) epilepsy, (b) mental retardation, (c) brief periods of intoxication caused by alcohol or drugs, or (d) dependence upon or addiction to any alcohol or drugs.

Minn.Stat. § 253B.02, subd. 13 (1982); *cf. id.* § 253A.04, subd. 17 (1982) (person mentally ill and dangerous to the public).

Given the present statute, the issues as to whether a recent overt act, attempt or threat of harm to self or others is required by due process and whether all respondents are immune from liability for damages are moot.

■ 3. Finally, appellant argues that due process "requires a preliminary judicial determination of probable cause within 72 hours of initial confinement, whether that be by physician or judicial hold order." Appellant relies in part on cases decided in other jurisdictions and in part on this court's decision in *State ex rel. Doe v. Madonna,* 295 N.W.2d 356 (Minn.1980).

Appellant was held at Brainerd State Hospital for 18 days without a hearing. Under the law then in effect:

Any person hospitalized pursuant to this section may be held up to 72 hours after admission, exclusive of Saturdays, Sundays, and legal holidays, unless a petition for the commitment of such person has been filed in the probate court of the county of residence or of the county wherein such hospital is located. If the head of the hospital deems such discharge not to be for the best interest of the person, his family, or the public and no other petition has been filed, he shall prior to the expiration of 72 hours after admission, exclusive of Saturdays, Sundays, and legal holidays, file a petition for the commitment of such person. Upon the filing of a petition, the court may order the detention of the person until determination of the matter. Upon motion of such hospitalized person the venue of the petition shall be changed to the probate court of the county of the per-

son's residence, if he be a resident of the state of Minnesota.

Minn.Stat. § 253A.04, subd. 3 (1980).

A petition was filed for appellant's commitment. The judicial commitment provision, Minn.Stat. § 253A.07, subd. 8 (1980) provided for a hearing within 14 days from the date of filing of the petition, with an extension of up to 30 days upon showing of good cause. Appellant's confinement without hearing for 18 days was authorized by Chapter 253A.

In *State ex rel. Doe v. Madonna,* this court held that when a petition for commitment had been filed and the proposed patient had been taken into custody and confined pursuant to Minn.Stat. § 253A.07, subd. 3 (1980):

[D]ue process compels a preliminary probable cause hearing at least within 72 hours of initial confinement under a hold order, unless the court extends the time for such a hearing on the basis of evidence demonstrating that a hearing within this period of time would have a serious adverse effect on the well-being of the confined patient, or that other emergency conditions justifying a continuance exist.

295 N.W.2d at 365 (citation omitted).

The court stated that involuntary commitment to a mental institution was a deprivation of liberty that could not be accomplished without due process of law. Citing cases relied on by the appellant here, the court wrote that "[a]lthough the state may have a compelling interest in temporary ex parte detention of persons dangerous to themselves or others, such detention is justified only for the amount of time necessary to prepare for a probable cause hearing before a neutral judge." *Id.* The court concluded that the hearing need not be as formal as a full commitment hearing, but does require adequate notice and opportunity to be represented by counsel. *Id.* at 365–66.

Appellant also looks to cases in other jurisdictions for support of his position. In *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D. Wis.1972), plaintiffs challenged the consti-

tutionality of the Wisconsin civil commitment statute. That statute permitted involuntary detention for up to 145 days without a hearing.[4] The court recognized that the state sometimes has a legitimate interest in confining, without a hearing, "persons who threaten violence to themselves or others" in order to protect society and those persons. 349 F.Supp. at 1091. Nevertheless, the court found that such detention was limited to the period necessary to arrange a probable cause hearing and that such a preliminary hearing must be held within 48 hours of confinement. *Id.* Similarly, in *Wessel v. Pryor,* 461 F.Supp. 1144 (E.D.Ark.1978), the court modified Arkansas civil commitment procedures to require that a petition for commitment be filed within 24 hours, excluding weekends and legal holidays, in emergency confinement situations and that the respondent would have the opportunity to appear in court within 24 hours (again excluding weekends and holidays) of the filing of the petition. *Id.* at 1147.

On the other hand, there are also cases, relied upon by the respondent, where prehearing periods of more than 72 hours have received court approval. In *Logan v. Arafeh,* 346 F.Supp. 1265 (D.Conn.1972), *aff'd sub nom. Briggs v. Arafeh,* 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973), a three-judge panel upheld the constitutionality of an emergency commitment statute under which a person certified as dangerous by a physician could be held up to 45 days without a hearing. *Coll v. Hyland,* 411 F.Supp. 905 (E.D.N.J.1976), another three-judge panel case, addressed the New Jersey civil commitment statute. The court found that no preliminary hearing was necessary where a final hearing was provided for within 20 days and the certifications of two physicians were required before temporary confinement. Other courts have also approved prehearing periods of more than 72 hours. *E.g., French v. Blackburn,* 428 F.Supp. 1351 (M.D.N.C.), *aff'd,* 443 U.S. 901,

99 S.Ct. 3091, 61 L.Ed.2d 869 (1977) (10 days); *Lynch v. Baxley,* 386 F.Supp. 378 (M.D.Ala.1974), *rev'd on other grounds,* 651 F.2d 387 (5th Cir.1981) (7 days); *Doremus v. Farrell,* 407 F.Supp. 509 (D.Neb.1975); *contra Bartley v. Kremens,* 402 F.Supp. 1039 (E.D.Pa.1975), *vacated and remanded,* 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977), *on remand sub nom. Institutionalized Juveniles v. Secretary of Public Welfare,* 459 F.Supp. 30 (E.D.Pa.1978).

Respondents argue due process does not require a hearing within 72 hours. They emphasize the statement in *State ex rel. Doe v. Madonna* specifically excluding Minn.Stat. § 253A.04 (1980) from consideration in that case. 295 N.W.2d at 361 n. 6. They point to valid reasons for the distinction between judicial and emergency hospitalizations. It is their view that more time may be required in emergency situations for proper diagnosis of persons detained. Where such persons are under the influence of drugs or alcohol, proper diagnosis must await the user's return to sobriety. Respondents contend that if the 72-hour period includes weekends and holidays, diagnosis and treatment will be hampered by a lack of trained personnel in state institutions. Finally, they note that under the new statute, a petition for commitment must be filed within 72 hours and a hearing held within 72 hours thereafter.

Appellant counters that both 72-hour periods exempt weekends and holidays. Consequently, with the right distribution of holidays, it is possible for 12 days to elapse between confinement and hearing. He also raises the possibility of serialized and consecutive emergency hold orders. Further, he argues that the reasoning of *State ex rel. Doe v. Madonna* is applicable here; that the deprivation of liberty is just as serious as in the case of judicial commitment and that there is no evidence of the impossibility of holding a hearing within 72 hours.

---

4. The statute permitted 5 days of emergency involuntary commitment, plus an additional 10 days if a court so decided. Additional extensions were permitted up to a total of 105 days.

If the patient requested a jury trial, the period could be extended another 40 days. 349 F.Supp. at 1090 n. 14.

A majority of this court finds that a hearing within 72 hours of confinement is not constitutionally mandated; there are more imperative reasons for a hearing within 72 hours in the case of a judicial commitment than where a skilled and licensed physician has found that an emergency hold is required. Moreover, we cannot conceive of a case where serialized emergency holds are permissible. The statute requires that a petition for commitment be filed within 72 hours of being held under emergency hold. The courts of this state are thus aware of the confinement and the statute then requires the courts to conduct a probable cause hearing within 72 hours after filing of the petition for commitment. In the great majority of cases where one has been held under the emergency hospitalization act, a hearing will be held within eight days. Any physician failing to provide for a filing of the petition for commitment would be exposing himself to liability.[5]

The trial court is affirmed in all respects.

---

**5.** In holding that a probable cause hearing within 72 hours of confinement on an emergency hold is not constitutionally mandated, we do not mean to suggest that requiring a hearing within that time period would be impossible or undesirable. The adoption of such a rule, however, is, at present, properly a matter for the legislature.