William A. JOHNSON, Respondent,

v.

Arthur E. NOOT, Commissioner of Public Welfare, Appellant.

Edward Lorance MATHEWS, Appellant,

v.

Arthur E. NOOT, Commissioner of Public Welfare for the State of Minnesota, Respondent.

Nos. 81–460, 81–696.

Supreme Court of Minnesota.

June 25, 1982.

Rehearing Denied Sept. 1, 1982.

Warren Spannaus, Atty. Gen., P. Kenneth Kohnstamm and John L. Kirwin, Sp. Asst. Attys. Gen., St. Paul, for Noot.

Philip Marron, Legal Assistance to Minnesota Prisoners, Minneapolis, for Mathews and Johnson.

AMDAHL, Chief Justice.

These cases, consolidated for appeal, raise important issues of first impression concerning the Minnesota Hospitalization and Commitment Act, Minn.Stat. §§ 253A.01–.21 (1980). Petitioners[1] appeal from decisions entered by three-judge appeal panels affecting their commitment status.

Petitioner William Johnson was committed to the Minnesota Security Hospital as mentally ill and dangerous by the Dakota County Probate Court on January 30, 1975. In 1976, while on provisional discharge, Johnson was convicted of aggravated assault and sentenced to 5 years at Stillwater Correctional Facility. His provisional discharge was not revoked or otherwise acted on during the period of incarceration.

On December 12, 1979, while still in prison, Johnson petitioned for a full discharge from his commitment. From a denial of this petition, Johnson appealed to the three-judge appeal panel. The appeal panel found that Johnson suffered from an anti-social personality disorder and was dangerous, but ordered him discharged because he was not mentally ill as that term is defined in Minn.Stat. § 253A.02, subd. 3 (1980).[2] The Commissioner of Public Welfare obtained a stay of proceedings from the appeal panel and appealed to this court.

Petitioner Edward Mathews was committed to the Minnesota Security Hospital as mentally ill and dangerous by the Sherburne County Probate Court on November 17, 1975. At that time Mathews was an inmate at the St. Cloud Correctional Facility, having been convicted of third degree murder in January 1973. On July 11, 1980, Mathews petitioned the Commissioner of Public Welfare for a discharge from his commitment. The special review board recommended that he be discharged, but the Commissioner denied the petition. The appeal panel affirmed the Commissioner's denial of discharge on the ground that Mathews continued to be mentally ill and dangerous by reason of his antisocial personality disorder.[3] Mathews has appealed to this court.

The social histories of these petitioners are all too familiar to those involved in the court and mental health systems. William Johnson, age 32, has been jailed at least 56 times and has been institutionalized for most of the past 10 years. Alcoholism often has been a contributing factor in his conduct; many of his incarcerations resulted from driving while intoxicated or reckless driving.

The record also discloses a pattern of violent conduct. In 1970, while intoxicated, Johnson shot out the windows of his parents' home with a shotgun. In January of 1974, again while intoxicated, Johnson

---

1. Johnson and Mathews are referred to as petitioners because they instituted the proceedings below by petitioning for discharge under the applicable statutory procedure.

2. Minn.Stat. § 253A.02, subd. 3 defines mental illness and sets out the findings necessary to commit a person as mentally ill. It provides:

    Subd. 3. "Mentally ill person" means any person diagnosed as having a psychiatric or other disorder which substantially impairs his mental health and as being in need of treatment or supervision. For the purpose of involuntary commitment of a person as mentally ill it is necessary for the court to find: (a) that the person is a mentally ill person, and (b) that involuntary hospitalization is necessary for the welfare of the person or the protection of society as defined in section 253A.07, subdivision 17, clause (a).

3. Judge Gerald Kalina, a member of the three-judge appeals panel, dissenting.

used a broken liquor bottle to threaten others when he was denied access to a bus. Later in 1974, Johnson, while intoxicated, threatened his spouse with a knife. In December 1976, while on provisional discharge to a halfway house, Johnson assaulted a college student in a bar by placing a knife to her throat. He had been drinking for approximately 10 hours that day but testified that he knew what he was doing. Johnson's behavior has shown significant improvement since 1979, which he attributes to his involvement with Alcoholics Anonymous since early in 1979.

On August 26, 1980, Johnson was released to a Minneapolis halfway house under what the Commissioner believed to be his still-existing provisional discharge of 1976. Johnson violated the terms of that discharge the next day by breaking the curfew and using alcohol. On August 29, 1980, the provisional discharge was revoked and Johnson has since been at the Security Hospital.

The experts who testified at the appeal panel hearing agreed that Johnson has an antisocial personality disorder, suffers from alcohol addiction, and is a dangerous person, but is not mentally ill. Based on this evidence, the appeal panel held that Johnson must be discharged under Minn.Stat. § 253A.15, subd. 2(a) (1980), because he is not mentally ill within the meaning of section 253A.02, subd. 3.

Petitioner Mathews, age 27, has been in a number of foster homes, state hospitals, and juvenile institutions from early childhood. He is presently incarcerated at the St. Cloud Reformatory where he is serving a 0–25 year sentence for murdering a 13-year old boy after sexually assaulting him. While in prison Mathews has accumulated a number of incident reports, including being caught with a knife, engaging in sexual misbehavior, and creating a fire hazard. Mathews has been transferred back and forth between the Reformatory and Minnesota Security Hospital on several occasions for "adjustment problems."

On November 17, 1975, Mathews was committed as mentally ill and dangerous. He remained at the Security Hospital for 10 months, during which time he admitted thoughts of violence, of being stimulated by violent sexual fantasies, and of killing young children. In May 1980, while at Security Hospital for reevaluation, Mathews made a violent outburst, swore at staff members, and threatened to kill another resident. When put in a cell, Mathews made a noose out of a bedsheet in an apparent suicide attempt or gesture. He was caught by a hospital staff member.

Experts who testified at the appeal panel hearing disagreed on the question of whether Mathews is mentally ill and dangerous. Dr. William Erickson, who testified on behalf of the Commissioner, concluded from his own evaluation that Mathews suffers from mental illness as defined by the Act, and that "he is at risk of committing violent acts and he is poorly equipped to handle his own impulses."

Dr. Patrick Stokes and Dr. Steven Doheny testified on behalf of petitioner Mathews. Dr. Stokes' evaluations of Mathews showed no signs of psychosis, neurosis, or significant mental illness. Stokes did discover definite antisocial tendencies, sexual identification problems, feelings of inferiority and defensiveness, and an impulsive nature. He concluded that even though Mathews suffers from an antisocial personality disorder, he is not mentally ill or dangerous as those terms are defined by statute. Dr. Doheny's testimony was in accord with that of Dr. Stokes. Based on the foregoing evidence, the appeal panel in No. 81–696 affirmed the Commissioner's denial of discharge.

The issues raised in these appeals are:

(1) Whether an antisocial personality disorder can support a finding of mental illness under chapter 253A and, if so, what is the proper standard for making such a determination;

(2) Whether a person committed as mentally ill and dangerous must be discharged when he is no longer mentally ill, even though he continues to be dangerous;

(3) Whether the appeal panels' findings in either 81–460 or 81–696 were clearly erroneous.

1. The parties agree that an antisocial personality disorder may, in some severe cases, substantially impair mental health. The question presented is at what point such a disorder is substantial enough to warrant its classification as mental illness. Petitioners argue that an antisocial personality disorder constitutes mental illness when it impairs the individual's ability to control his actions. The Commissioner, on the other hand, argues that if the disorder affects the person's thought, emotional or judgment processes, as well as the person's behavior, then the disorder is a mental illness as defined by the Commitment Act.

■ Authority in both the statutory and the common law in Minnesota supports the conclusion that a person with an antisocial personality disorder is not mentally ill under section 253A.02, subd. 3, unless he has lost the ability to control his actions. *See* Minn.Stat. §§ 526.09–.11 (1980); *State ex rel. Pearson v. Probate Court*, 205 Minn. 545, 287 N.W. 297 (1939). A psychopathic personality, as defined by section 526.09, is a special type of antisocial personality disorder characterized by irresponsibility toward sexual matters. Persons having a psychopathic personality are subject to the same provisions of chapter 253A as are persons deemed to be mentally ill and dangerous. *See* Minn.Stat. § 526.10 (1980). In interpreting the scope of the sexual psychopath statutes in *Pearson*, we held that—

> [T]he act is intended to include those persons who, by a habitual course of misconduct in sexual matters, have evidenced an *utter lack of power to control their sexual impulses* and who, as a result, are likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and *uncontrollable* desire. It would not be reasonable to apply the provisions of the statute to every person guilty of sexual misconduct nor even to persons having strong sexual propensities. Such a definition would not only make the act impracticable of enforce-

ment and, perhaps, unconstitutional in its application, but it would also be an unwarranted departure from the accepted meaning of the words defined.

205 Minn. at 555, 287 N.W. at 302–03 (emphasis added). So, in this case, the "lack of control" test that we apply to determine whether an antisocial personality disorder constitutes mental illness is intended to isolate only the most severe cases. As petitioners argue, the result would be anomalous were we to hold that the legislature intended a more lenient standard for the commitment of persons with antisocial personalities generally than that required for commitment of the most dangerous of such character disorders, the sexual psychopath.

We applied the "lack of control" standard, without referring to it as such, in *Lausche v. Commissioner of Public Welfare*, 302 Minn. 65, 225 N.W.2d 366, *cert. denied*, 420 U.S. 993, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975). In *Lausche*, we held, *inter alia*, that sufficient evidence was presented to support an appeal panel decision that the appellant was mentally ill and dangerous. Our holding was based, in part, on a finding by the appeal panel that the appellant's sociopathic character disorder was "of such a nature and intensity that he *cannot control his impulse* to do violence and injury to other persons or property." *Id.* at 68, 225 N.W.2d at 368. Based upon the statute and upon *Lausche,* (emphasis added) we hold that a character disorder substantially impairs mental health and therefore constitutes mental illness only when the disorder takes away the person's ability to control his conduct. Only at that point, as Dr. Steven Doheny testified at the Mathews hearing, does the character disorder's effect on mental health reach the degree of impairment caused by traditional psychiatric disorders.[4]

2. The Commissioner argues on appeal that a person validly committed as mentally ill and dangerous may not be discharged as long as he remains dangerous to the public, even though he is no longer mentally ill.

---

**4.** Section 253A.02, subdivision 3, also requires that the person be "in need of treatment or supervision." That part of the definition of a

mentally ill person is not in dispute in these cases.

The Commissioner's argument is premised on the wording of section 253A.15, subd. 2(a) of the Act, which provides that the Commissioner may not discharge a person committed as mentally ill and dangerous unless the Commissioner and the special review board find "that the patient is capable of making an acceptable adjustment in society." This court has never construed the quoted language.

Section 253A.01, subd. 17 defines a person dangerous to the public as "a person who is mentally ill or mentally deficient *and* whose conduct might reasonably be expected to produce a clear and present danger of injury to others." (Emphasis added). Because the statutory definition includes the elements of mental illness or deficiency, there exists a clear legislative intent that the word "dangerous" not be given its ordinary meaning. The Commissioner argues that the statute gives him and the appeal panel the discretion to determine in each case whether a patient is dangerous in the ordinary sense of that word, irrespective of the patient's mental condition. Such a construction of the statute is contrary to its plain meaning.

The statutory definition shows a recognition by the legislature of the obvious problems involved in predicting dangerousness. Many psychiatrists themselves admit that their ability to predict future dangerousness is not reliable; to date, no valid clinical experience or statistical evidence reliably describes psychological or physical signs or symptoms that can be reliably used to discriminate between the harmless and the potentially dangerous individual.

Dr. Bernard Diamond, a professor of both law and psychiatry at the University of California, Berkeley, and a widely respected expert on this subject, has written:

> Neither psychiatrists nor other behavioral scientists are able to predict the occurrence of violent behavior with sufficient reliability to justify the restriction of freedom of persons on the basis of the label of potential dangerousness. Accordingly, it is recommended that courts no longer ask such experts to give their opinion of the potential dangerousness of any person, and that psychiatrists and other behavioral scientists acknowledge their inability to make such predictions when called upon to do so by courts and other legal agencies.

Diamond, *The Psychiatric Prediction of Dangerousness*, 123 U.Pa.L.Rev. 439, 452 (1974).

■ For the reasons stated, we hold that the statutory criteria for discharge of persons committed as mentally ill and dangerous—that the patient is "capable of making an acceptable adjustment in society"—be construed to mean that the patient is either no longer mentally ill or no longer dangerous.[5]

3. The final issue we address is whether the appeal panels' findings in either 81–460 or 81–696 were clearly erroneous. The function of this court is not to weigh the evidence as if trying the matter *de novo*, but to determine from an examination of the record if the evidence as a whole sustains the appeal panels' findings. If it does so, it is immaterial that the record might also provide a reasonable basis for inferences and findings to the contrary. *Don Kral, Inc. v. Lindstrom*, 286 Minn. 37, 42, 173 N.W.2d 921, 924 (1970).

■ In *Johnson*, the appeal panel's finding that petitioner was not mentally ill was clearly in accord with the weight of the evidence. No direct testimony supported a finding of mental illness; Drs. Sheppard and Wohlrabe agreed that Johnson was not mentally ill. The appeal panel's finding cannot be said to be clearly erroneous.

■ In *Mathews*, four doctors presented testimony on petitioner's mental condition. The three who were the most familiar with Mathews' case agreed that, although he suffered from an antisocial personality disorder, he was not mentally ill within the

---

5. Our construction of the statute is the same as that offered in Note, *Standard and Burden of Proof in Mental Commitment and Release Pro-* ceedings, 3 Wm. Mitchell L.Rev. 193, 216 (1977).

meaning of the statute. Dr. Doheny specifically noted that Mathews has the ability to control his impulses. The fourth doctor, Dr. William Erickson, testified that Mathews does suffer from mental illness as defined by the Commitment Act. However, Dr. Erickson based his conclusions on an examination of Mathews' history, a 1-hour interview, and the erroneous assumption that Mathews had remained on antipsychotic medication for the past 5 years. Because the reliable evidence supports the conclusion that, although Mathews suffers from an antisocial personality, that disorder in no way impairs his ability to control his actions and to be responsible for them, he is discharged from his commitment.[6]

We therefore affirm the appeal panel in No. 81–460 [7] and reverse the appeal panel in No. 81–696.

Affirmed in part; reversed in part.

KELLEY, J., took no part in the consideration or decision of this case.

---

6. Mathews' discharge will cause him to be returned to incarceration at the St. Cloud Reformatory, where he will continue to serve his 0–25 year sentence for the murder conviction.

7. Because we affirm the ruling of the appeal panel in 81–460, we choose not to address the question raised by petitioner Johnson whether Minn.Stat. § 253A.15, subd. 4 (1980), which provides that a provisional discharge may become absolute after 1 year, applies to patients committed as mentally ill and dangerous.