COUNTY OF HENNEPIN, Respondent,

v.

Leonard LEVINE, etc., Petitioner,

and

Cora Sheppo, et al., Respondents.

No. CO–83–207.

Supreme Court of Minnesota.

Feb. 17, 1984.

Hubert H. Humphrey, III, Atty. Gen., John L. Kirwin, Sp. Asst. Atty. Gen., St. Paul, for petitioner.

Thomas L. Johnson, Co. Atty., Peter J. Fransway, Asst. Co. Atty., Minneapolis, for respondent County of Hennepin.

Susan L. Lentz, Melvin B. Goldberg, Foundation for Legal Assistance, Research and Education, Inc., William Mitchell Law Clinic, St. Paul, for respondents Cora Sheppo, et al.

AMDAHL, Chief Justice.

In 1982, the Minnesota Legislature substantially revised and recodified the statute governing civil commitment. *See* Minnesota Commitment Act of 1982, ch. 581, §§ 1–26, 1982 Minn.Laws 1329–59 (repealing Minn.Stat. §§ 253A.01–.23 (1980)) (currently codified at Minn.Stat. §§ 253B.01–.23 (1982)). This case requires us to construe certain provisions of the Minnesota Civil Commitment Act of 1982 (hereinafter the Act) that relate to patients committed as mentally ill and dangerous (MID). More specifically, we must decide whether the Act prohibits the head of a treatment facility from utilizing passes [1] without prior approval of a special review board [2] in the treatment of patients committed as MID.

On December 30, 1982, respondent Hennepin County initiated this declaratory judgment action against Arthur Noot,[3] Commissioner of Public Welfare, alleging that he failed to comply with the procedures set forth in the Act governing the granting of passes to persons committed as mentally ill and dangerous.

On January 10, 1983, respondents Cora Sheppo, Michael Raines, Daniel Oas, and Michael Matson moved to intervene. In addition, Bruce Wollan, committed as MID and providing the impetus for Hennepin County's action, moved to intervene. On January 14, 1982, the Hennepin County District Court granted both motions to intervene. On the same day, the trial court denied the county's request for a temporary restraining order.

Because petitioner Levine's office was located in St. Paul, and the actions challenged took place in Ramsey County, petitioner requested a change of venue. The court issued an order transferring the file to Ramsey County. On January 18, 1983, respondents moved the Ramsey County District Court to return the case to Hennepin County. This motion was granted on January 20, 1983, returning the case to Hennepin County for trial.

On January 24 and 26, a motion for a temporary injunction and a trial on the merits were heard by the Hennepin County District Court. An order was filed on January 28, 1983, granting the relief requested by Hennepin County. The order precluded the issuance of a pass to any person committed as MID without the consent of the special review board. This order was stayed until February 14, 1983. We reverse.

The facts are not disputed. This case concerns the Department of Public Welfare's release for fixed periods of time of patients committed as MID. Specifically, Hennepin County objected to the issuance of passes to intervenor, Bruce Wollan, and alleged that Wollan presented a threat to

1. The passes involved vary in length and character; they range from a short, initial, escorted, on-grounds pass with hospital staff to a 10-day, unescorted, off-grounds pass.

2. Under Minn.Stat. § 253B.18, subd. 4 (1982), the Commissioner of Public Welfare is required to establish a special review board to "hear and consider all petitions relative to discharge, provisional discharge and revocation of provisional discharge, and make recommendations to the

commissioner" regarding MID patients. A special review board consists of a physician, an attorney, and a lay person; all three members must be "experienced in the field of mental illness." Minn.Stat. § 253B.18, subd. 4 (1982).

3. Shortly after initiation of this action, Leonard Levine replaced Arthur Noot as Commissioner of Public Welfare.

the public safety of the citizens of Hennepin County.

Wollan's history is indeed checkered. In 1969, Wollan was committed to Anoka State Hospital as mentally ill. Shortly after commitment, Wollan was "absent without leave" for 1 day and was returned to Anoka State Hospital.

In March 1970, Wollan was provisionally discharged by the Anoka State Hospital to the care and custody of his parents. In less than 1 year, the Anoka Hospital staff was informed by Wollan's parents that he was not complying with the provisions of his discharge. The hospital revoked Wollan's provisional discharge and he returned to the hospital. A later provisional discharge was also revoked. The hospital staff considered Wollan dangerous and inclined to violence toward his mother. After direct discharge from Anoka State Hospital, Wollan attacked his sister with a meat cleaver. As a result of this incident, Wollan was convicted of aggravated assault and sentenced to St. Cloud Reformatory. Wollan was medically paroled to the Minnesota Security Hospital in June 1972. A regular parole followed in 1973 which was revoked in 1976. After another parole, Wollan bit the right ear of a guest at a friend's party. Wollan remained paroled.

On June 12, 1978, Wollan attacked his mother with a fireplace poker and stabbed her in the chest. Beatrice Wollan died as a consequence of her son's attack. Wollan was charged with first-degree murder in September 1981 and found not guilty by reason of insanity. Hospitalization was ordered and Wollan was committed to Minnesota Security Hospital as MID.

Hennepin County asserts that allowing individuals like Bruce Wollan to participate in the pass program creates a significant risk of harm to the public. The county also claims that the pass program violates the Act.

A brief overview of the purposes underlying the Act, and a more particular discussion concerning the pass program and special review board procedures, aids our resolution of the legal issue presented.

Involuntary civil commitment is one of the most extreme forms of intervention existing in our legal system. The process requires, necessarily, a significant deprivation of individual liberty. Laws providing for involuntary commitment are generally grounded on two notions: (1) the state's responsibility to protect society; and (2) the state's parental responsibility for the disabled. *See* Weissbourd, *Involuntary Commitment: The Move Toward Dangerousness*, 15 John Marshall L.Rev. 83, 85 (1982).

In contrast to the retribution-deterrence principle underlying the criminal justice system, civil commitment is grounded on a prediction-prevention model. *Id.* at 86. An equally compelling function of involuntary civil commitment is rehabilitation. *Id.* at 87. This case epitomizes the tension that exists between the state's role in protecting its citizens and the state's role in rehabilitating mentally ill individuals in its custody.

The Act emphasizes treatment of mentally ill individuals in the least restrictive manner.[4] *See, e.g.,* Minn.Stat. §§ 253B.03, subd. 1, 253B.12, subd. 7 (1982). *See also* Janus & Wolfson, *The Minnesota Commitment Act of 1982: Summary and Analysis*, 6 Hamline L.Rev. 41, 75–77 (1983) (hereinafter Janus). The least restrictive alternative principle has three applications in the context of the Act. First, the actual commitment must be justified by a listing of the less restrictive alternatives available and the reasons for their rejection. Minn. Stat. § 253B.09, subd. 2 (1982). *See also* Janus, *supra* at 75. Second, "[o]nce it is determined that the criteria for commitment have been met, and that there is no

---

**4.** Perhaps the best example of the insistence upon least restrictive means treatment is Minn. Stat. § 253B.04 (1982). It provides in part that "*[i]nformal admission by consent is preferred over involuntary commitment.*" Minn.Stat. § 253B.04, subd. 1 (1982) (emphasis added).

*See also* Minn.Stat. § 253B.18, subd. 2 (1982) (requiring committing court to review MID commitment after 60 days; if patient is not dangerous, then release through special review board procedures not necessary).

alternative available less restrictive than involuntary commitment, the court must determine which treatment facility can meet the proposed patient's needs consistent with the statutory 'right to treatment' provisions, in the least restrictive manner." Janus, *supra* at 76. *See also* Chambers, *Alternatives to Civil Commitment*, 70 Mich.L.Rev. 1107 (1972). Third, the Act underscores the necessity of commitment by the least restrictive means. *See* Minn. Stat. § 253B.03, subd. 7 (1982); *cf. Johnson v. Noot*, 323 N.W.2d 724 (Minn.1982); *Cairl v. State*, 323 N.W.2d 20 (Minn.1982) (both *Cairl* and *Johnson* were decided under the previous civil commitment act, but both illustrate our view of treatment by the least restrictive means).

The Act balances the competing interests of public safety and the interests of individual patients. When an MID patient is committed, the Act mandates commitment to the Minnesota Security Hospital; transfer to any open facility (such as Anoka) requires special review board or court approval. *See* Minn.Stat. § 253B.18, subd. 6 (1982). Transfer decisions under the statute necessitate an evaluation of public safety considerations. *See* Minn.Stat. § 253B.18, subd. 6(v) (1982). Initial commitment as MID to an open facility also requires similar special review board or court approval. *See* Minn.Stat. § 253B.18, subd. 1 (1982).

Subsequent to commitment, the Act treats persons committed as MID separately and differently from those committed as mentally ill.[5] *Compare* Minn.Stat. §§ 253B.16–.17 (1982) *with* Minn.Stat. § 253B.18 (1982). *See also* Janus, *supra* at 49. The distinction is sharpest with respect to release or discharge. *Compare* Minn.Stat. § 253B.17 (1982) *with* Minn. Stat. § 253B.18 (1982). Section 253B.17 governs release or discharge of *"[a]ny* patient, except one committed as mentally ill and dangerous to the public * * *." *Id.* (emphasis added). The discharge or provi-

sional discharge of any patient committed as MID is controlled by Minn.Stat. § 253B.18 (1982). Further distinctions between patients committed as MID and other committed persons are found in Minn. Stat. § 253B.15 (1982). *See also, infra,* note 7 and accompanying text.

The central issue in the instant case is the granting of passes to patients committed as MID. As mentioned previously, passes vary in length and character; they range from an initial, on-grounds, escorted pass to a maximum of 10 days away from the hospital.

Whenever any unsupervised pass that is off grounds and for one night or longer is contemplated, a warning procedure is implemented. All interested persons, including the sheriff and the committing judge, are notified 2 weeks in advance of issuance of the pass. Notified parties also include family and parties who originally petitioned for commitment. Although Department of Public Welfare employees make the ultimate decision regarding the issuance of a pass, feedback from notified parties is invited and considered. If a notified party objects to the issuance of a pass, the decision is "stayed" 2 weeks and reconsidered in light of the objections and information provided by the notified party. Occasionally, a patient's behavior is monitored by persons in the community, and the patient's behavior is always scrutinized by his/her treatment team.

The passes play a central role in the treatment of MID patients. Dr. Brian Gotlieb testified that passes "are the most important part of the program, particularly as we reach the point of having to assess whether the patient can safely readjust to life in the community. It's the single most important thing." The passes are consistent with the least restrictive means policy underlying civil commitment in Minnesota and are designed to further the goal of enabling the patient to reenter the community safely. In addition, passes aid a pa-

---

**5.** The Act creates four categories of persons requiring commitment: chemically dependent, mentally ill, mentally retarded, and mentally ill

and dangerous. *See* Minn.Stat. § 253B.02, subds. 2, 13, 14, 17 (1982).

tient's treatment team and the special review board in their evaluation of whether an individual has progressed to a point where discharge is appropriate.

The pass program also provides an incentive to patients. The staff uses a psychosocial rehabilitation model of treatment to encourage patients to maintain ties with their families, friends, and communities to facilitate reintegration into society. Passes provide patients with recreational and social opportunities not available at the hospital. Dr. William Routt testified that suspension of the pass program would severely restrict the treatment staff's ability to implement a treatment plan. In his opinion, passes are an integral part of treatment. Moreover, Dr. Routt stated that suspension of passes may create a feeling of hopelessness for some patients.

The Department of Public Welfare has used passes consistently for many years. Use of the pass system as a form of treatment and evaluation is illustrated by the special review board's consideration of MID patients' progress under the pass system in determining whether to discharge a patient.

The special review board is created under the Act exclusively to consider and make recommendations to the commissioner relating to any type of anticipated discharge of a patient committed as MID.[6] *See* Minn. Stat. § 253B.18, subd. 4 (1982). *See also, supra,* note 2. The initial step in the special review board process is the filing of a petition with the Commissioner of Public Welfare. Upon filing of a petition, a hearing date is set, typically 1 month after the filing date, to provide for the required 14-day notification period for all interested parties. Generally, the special review board considers about four cases a day

with hearings ranging from ½ hour to 1 hour.

Following the special review board meeting, the board makes a determination. The attorney member drafts findings that are forwarded to the commissioner within approximately 2 weeks. The commissioner issues a decision 3 or 4 days later, based on the findings of the special review board.

Passes are not characterized by Department of Public Welfare employees as discharges requiring approval by the special review board under Minn.Stat. § 253B.18 (1982). Decisions regarding the issuance of a pass are not made by the special review board. Rather the initial, *unsupervised* pass is granted by the medical director of the facility upon the recommendation of the treatment team, unit physician, and psychiatrist. Thereafter, the treatment team, unit physician, and psychiatrist decide whether a pass should be granted. The special review board, however, is aware of the pass program and frequently asks the staff to describe to the board the number and nature of passes issued to a patient when considering that patient's petition for release.

As mentioned previously, the special review board is required to hear, consider and recommend disposition of "all petitions relative to discharge, provisional discharge and revocation of provisional discharge" relating to MID patients. Minn.Stat. § 253B.18, subd. 4 (1982). Hennepin County asserts that "passes" are either a discharge or a provisional discharge. Although the trial court granted the relief requested by the county, it did not attempt to characterize passes specifically as discharges or provisional discharges.

In its order and memorandum, the district court acknowledged that a pass was

---

**6.** In 1982 the special review board met 35 times and reviewed 117 cases. Requiring the special review boards to consider whether a patient committed as MID is eligible for a pass creates significant administrative problems. The special review boards will have to meet with greater frequency and consider more individual cases per meeting. Consequently, the Department of Public Welfare's budget allocation for

special review boards will increase substantially. Even more significantly, special review board consideration of pass eligibility will result in a delay in the treating physician's ability to use an incentive; the rehabilitative facet of the pass program diminishes when the incentive is not immediate. Notwithstanding our recognition of these problems, we do not rely on them to decide this case.

not the same as a discharge or a provisional discharge. In fact, passes are not mentioned anywhere in the Act. Irrespective of the clear distinction between a pass and any form of discharge, the district court elected to delegate to the special review board the authority to regulate and monitor the issuance of passes. No statutory authority exists for this expansion of special review board jurisdiction.

Under the Act, a provisional discharge is defined and discussed as follows:

> Subd. 7. *Provisional discharge.* Patients who have been found by the committing court to be mentally ill and dangerous to the public shall not be provisionally discharged unless it appears to the satisfaction of the commissioner, after a hearing and a favorable recommendation by a majority of the special review board, that the patient is capable of making an acceptable adjustment to open society.

The following factors are to be considered in determining whether a provisional discharge shall be recommended: (a) whether the patient's course of hospitalization and present mental status indicate there is no longer a need for inpatient treatment and supervision; and (b) whether the conditions of the provisional discharge plan will provide a reasonable degree of protection to the public and will enable the patient to adjust to the community.

> Subd. 8. *Provisional discharge plan.* A provisional discharge plan shall be developed, implemented and monitored by the designated agency in conjunction with the patient, the treatment facility and other appropriate persons. The designated agency shall, at least quarterly, review the plan with the patient and submit a written report to the commissioner and the treatment facility concerning the patient's status and compliance with each term of the plan.

Minn.Stat. § 253B.18, subds. 7, 8 (1982). Passes are used for rehabilitative and evaluative purposes. In contrast, a provisional discharge closely parallels a parole; a provisional discharge is a discharge with specific conditions attached to the discharge. Violation of the provisions results in a revocation of the discharge and implementation of more treatment. *See* Minn.Stat. § 253B.18, subd. 10 (1982). It is obvious that a pass is not the same as a provisional discharge.

Petitioner asserts that a pass is a form of partial institutionalization. The Act defines and governs partial institutionalization as follows:

> Subd. 11. *Partial Institutionalization.* The head of a treatment facility may place *any* committed person on a status of partial institutionalization. The status shall allow the patient to be absent from the facility for certain fixed periods of time. The head of the facility may terminate the status at any time.

Minn.Stat. § 253B.15, subd. 11 (1982) (emphasis added). Section 253B.15 governs both provisional discharge and partial institutionalization. Subdivision 1 provides that "[t]he head of the treatment facility may provisionally discharge *any* patient * * * *unless* he was found by the committing court to be mentally ill and dangerous to the public." *Id.* (emphasis added). Subdivisions 2 through 10 outline the procedure to be followed to implement a subdivision 1 provisional discharge. *See* Minn.Stat. § 253B.15, subds. 2–10 (1982). Because section 253B.15 expressly omits MID patients from the purview of subdivision 1 and fails to make a similar distinction in subdivision 11, it is arguable that the legislature intended the status of partial institutionalization be available to all committed persons. This argument is even more persuasive when the Act's consistent distinction between MID patients and other committed persons is examined.[7] Finally, the logic of

---

7. With respect to the *rights* of all committed persons, the Act fails to differentiate MID patients from other committed individuals. *See, e.g.,* Minn.Stat. § 253B.03 (1982) (general rights of all patients); section 253B.07 (preliminary procedures for judicial commitment); section 253B.08 (hearing procedures for judicial commitment). The distinction, however, is express

the argument is strengthened by the separate statutory provision exclusively governing provisional discharge for MID patients. *See* Minn.Stat. § 253B.18 (1982).

Section 253B.15, subd. 11 (1982), classifies partial institutionalization as a commitment status. Section 253B.18, subd. 3 (1982), provided that an MID patient's commitment status could be altered *"only* as provided in this section." *Id.* In 1983, however, the legislature amended Minn. Stat. § 253B.18, subd. 3 (1982). The amendment reads as follows:

> *If the court finds* at the hearing held pursuant to subdivision 2 *that the patient continues to be mentally ill and dangerous, then* the court ~~may~~ *shall* order commitment of the proposed patient for an indeterminate period of time. Subsequent to a final determination that a patient is mentally ill and dangerous to the public, the patient shall be transferred, provisionally discharged, *or* discharged ~~or have his commitment status altered~~ only as provided in this section.

Act of June 1, 1983, ch. 251, § 20, 1983 Minn.Laws 1002. Elimination of the "commitment status" language further strengthens petitioner's argument; MID patients' commitment status can be altered without special review board approval. Consequently, partial institutionalization under Minn.Stat. § 253B.15, subd. 11 (1982),

is a commitment status available to *all* committed patients.

The pass program is a type of commitment status and is accurately characterized as a form of treatment beyond the ambit of special review board jurisdiction. We hold that the pass program is a form of partial institutionalization under Minn.Stat. § 253B.15, subd. 11 (1982). The evidence adduced below and the 1983 amendment of section 253B.18, subd. 3 (1982), overwhelmingly support this conclusion. The pass system is a rehabilitative form of treatment; it is an essential aspect of treatment of MID patients in the least restrictive fashion. To require special review board approval of issuance of passes would "tie the hands" of the treating physician and eviscerate the physician's discretion necessary for treatment of patients committed as MID. The public's safety is protected through the actual commitment and discharge process.[8] Further attempts to predict dangerousness result in an exercise in futility.[9]

Reversed.

---

where the Act regulates *postcommitment procedures and treatment. See e.g.,* Minn.Stat. § 253B.09, subd. 5 (1982) (duration of initial commitment period for mentally ill, mentally retarded, or chemically dependent patients); section 253B.13 (duration of continued treatment for all committed individuals except MID patients); section 253B.12, subd. 8 (transfer to informal status procedural for all committed individuals except MID patients); section 253B.18 (procedures governing MID patients).

**8.** Section 253B.22 requires the commissioner to establish a review board, identical to a special review board, "for each regional center to review the admission and retention of patients institutionalized under this chapter." The regional review boards, thus, monitor the progress of patients committed to state hospitals. The Act requires these regional review boards to visit each treatment facility every 6

months. Minn.Stat. § 253B.22, subd. 2 (1982). At oral argument none of the parties were certain whether these regional review boards had in fact been established. If regional review boards have not been established, we urge the Department of Public Welfare to expedite their creation. Regional review boards provide an additional method of evaluating any potential risk of harm to the public created by the use of passes.

**9.** "Neither psychiatrists nor other behavioral scientists are able to predict the occurrence of violent behavior with sufficient reliability to justify the restriction of freedom of persons on the basis of the label of potential dangerousness." Diamond, *The Psychiatric Prediction of Dangerousness,* 123 U.Pa.L.Rev. 439, 452 (1974) (quoted in *Johnson v. Noot,* 323 N.W.2d 724, 728 (Minn.1982)).