Richard ENEBAK, petitioner, Appellant,

v.

Arthur NOOT, Commissioner of Public Welfare for State of Minnesota, Respondent.

No. C3-83-637.

Supreme Court of Minnesota.

Aug. 3, 1984.

William F. Messinger, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Mary Ann Bernard, Sp. Asst. Atty. Gen., St. Paul, Charles Diemer, Asst. Dakota County Atty., Hastings, for respondent.

YETKA, Justice.

Petitioner Richard Enebak is committed to the Minnesota Security Hospital as a psychopathic personality pursuant to Minn. Stat. § 526.10 (1982). A psychopathic personality is characterized by sexual conduct so irresponsible that the individual is dangerous to the public. Minn.Stat. § 526.09 (1982). Petitioner appeals from the decision of a panel of three probate judges denying his request for a provisional discharge from his commitment. We affirm.

Petitioner requested discharge before the Special Review Board in March 1982. The board recommended against discharge, finding that petitioner "tends to continue to deny his difficulties and minimize the severity of his sexual misconduct." Based upon the board's findings and recommendation, the Commissioner of Public Welfare denied the petition. Petitioner appealed to a three-judge panel.

The panel heard the matter *de novo* and also denied the discharge request. The panel concluded that petitioner had failed to prove that he no longer required inpatient treatment or that the discharge plan would provide a reasonable degree of protection to the public as required by Minn. Stat. § 253B.18, subd. 7 (1982), the provisional discharge statute. The panel also found that petitioner had not proved that he would be able to control his sexual behavior under the proposed provisional discharge. Petitioner took this appeal.

Petitioner is in his early 50's. He is diagnosed as having an "antisocial personality disorder," but no major mental illnesses. He has a history of commitment and imprisonment for sexual offenses dating back to 1955. In 1955, he was committed to the Security Hospital as a psychopathic personality. During that hospitalization, he admitted to numerous rapes. In 1961, he assaulted a 17-year-old girl in his car while helping her move out of her apartment. As a result, he was sentenced to 0–4 years at Stillwater and served 2½ years of his term. From 1966–67, he was convicted of several sexual misdemeanors for which he served two sentences in the workhouse. From the record, the state estimates that petitioner committed at least 37 sexual assaults between 1955 and 1969.

The incident which resulted in his current commitment occurred in 1969. It is illustrative of the pattern of his sexual misconduct. He picked up a 16-year-old girl and gave her liquor until she became quite intoxicated. Then he took off her clothes and took pictures of her. The pictures showed bruises about her breasts, buttocks

and thighs. He had intercourse with her. Sometime during the evening, several vertebrae in her back were broken, resulting in permanent paralysis from the waist down. In the morning, he took her to an empty field in Eagan and abandoned her. She was discovered about 7:00 p.m., partially clothed, with the lower part of her body exposed. Her face was sunburned and she was unable to move. She was bleeding from the vagina and anus. Examination at St. Paul Ramsey Hospital revealed severe lacerations of the vagina and other internal injuries.

When petitioner was arrested for this assault, the police searched his shop in Minneapolis and discovered slides and motion pictures of 35 different women, including the victim. Many looked intoxicated or drugged. They were in various stages of undress, and many had bruises about the breasts, buttocks and back.

In January 1970, petitioner was committed to the Minnesota Security Hospital as a psychopathic personality for this assault. He was also charged with the crimes of aggravated rape, indecent liberties, and aggravated assault. In December 1974, he pled guilty to the crime of indecent liberties and was placed on probation for a period of 10 years.

In 1975, petitioner was transferred to St. Peter State Hospital upon recommendation of the Special Review Board and the Commissioner of Public Welfare. Within a short time, he became sexually involved with another patient who was both mentally retarded and psychotic. In June 1976, petitioner committed a sexual assault while out of the hospital on unsupervised pass. He picked up a young girl in St. Paul and tried to persuade her to insert a deodorant bottle into her vagina.

As a result of this incident, petitioner's probation was revoked by the Dakota County District Court and a 10-year sentence was imposed. He was taken to Stillwater Prison, where he began to serve his time. In October 1978, he was returned to Minnesota Security Hospital as the result of a decision by this court holding that he should not have been placed in the prison without a transfer hearing pursuant to Minn.Stat. § 253A.14 (1978). *See State v. Enebak,* 272 N.W.2d 27 (Minn.1978).

Petitioner has requested provisional discharge once before in 1979. The commissioner and the three-judge panel both denied discharge. The panel found that petitioner's unwillingness to discuss openly his sexual behavior precluded a finding that he was not sexually dangerous. The panel also noted testimony that a history of repetitive sexual crime was the single strongest predictor of likely future sexual crime and that highly recidivistic sex offenders are not very susceptible to treatment. Petitioner did not appeal.

Petitioner's prison sentence was discharged in October 1981. At that time, the medical director of the Minnesota Security Hospital began allowing petitioner to leave the hospital for three nights per week on unsupervised pass. In August 1982, this time was expanded to four nights per week. Petitioner was released to his home in Dakota County where his wife and 12-year-old daughter lived. (The Enebaks have been married 32 years and have four children. Only the youngest is at home.) Petitioner traveled back and forth from the hospital by bus unaccompanied by hospital staff. There were no reported incidents of misbehavior during his passes.

Petitioner's second request for provisional discharge was denied by the Special Review Board in April 1982 based on their finding that petitioner's condition had not changed since the denial of discharge in 1980. The commissioner and a three-judge panel agreed.

The issues on appeal are:

1. Whether the court erred by failing to apply the discharge standards contained in *Johnson v. Noot,* 323 N.W.2d 724 (Minn.1982), and

2. Whether the evidence as a whole supports the denial of discharge.

1. Appellant argues that the panel's failure to apply *Johnson v. Noot* constitutes reversible error for two reasons:

First, *Johnson v. Noot* was not superseded by the legislature's enactment of Minn. Stat. § 253B.18, subd. 7 (1982) relating to provisional discharge; and, second, even if the case were superseded by the new act, *Johnson* must be applied because its holding is of federal constitutional dimensions.

*Johnson v. Noot* interpreted provisions in the prior commitment act relating to the discharge of patients committed as mentally ill and dangerous (MID). We held that a person with an antisocial personality disorder is not mentally ill under Minn.Stat. § 253A.02, subd. 3 (1980) (repealed 1982) unless he has lost the ability to control his actions. 323 N.W.2d at 727. We also held that Minn.Stat. § 253A.15, subd. 2(a) (1980) (repealed 1982) allowing release if the patient "is capable of making an acceptable adjustment in society" requires discharge if the patient is found to be no longer mentally ill (as defined by ability to control behavior) *or* no longer dangerous. 323 N.W.2d at 728. We noted in *dicta* that the legislature's definition of "dangerous" recognized the difficulties involved in predicting dangerousness. *Id.*

On the basis of this case, petitioner claims that he must be discharged because (1) he has demonstrated an ability to control his behavior by his weekly unsupervised leaves over a 14-month period, and (2) *Johnson* precludes predictions of dangerousness from entering into the discharge decision.

*Johnson's* discharge standards were based on the prior commitment act. Since that case, the legislature has enacted its own standards to be considered in the discharge decision. Minn.Stat. § 253B.18, subd. 7 (1982) is the legislature's response to *Johnson*. The statute provides:

> The following factors are to be considered in determining whether a provisional discharge shall be recommended: (a) whether the patient's course of hospitalization and present mental status indicate there is no longer a need for inpatient treatment and supervision; and (b) whether the conditions of the provisional discharge plan will provide a reasonable degree of protection to the public and will enable the patient to adjust to the community.

▮ These factors parallel the *Johnson v. Noot* standards of mental illness and dangerousness, but define them more clearly. The statute is a clear legislative mandate that the need for inpatient treatment and the degree of protection to the community are the factors to be considered in the discharge decision. Therefore, the panel's application of the statute, rather than the *Johnson* case, was correct and must be upheld.[1]

Petitioner argues that *Johnson* is of federal constitutional dimensions, citing *Jones v. United States*, ⸺ U.S. ⸺, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). In *Jones*, the Supreme Court held that, when a criminal defendant is acquitted by reason of insanity, he may be confined to a mental institution "until such time as he has regained his sanity or is no longer a danger to himself or society." 103 S.Ct. at 3052. The holding rests on the premise that the purpose of confinement is not punitive, but rather is related to the patient's continuing illness and dangerousness. Once the patient no longer requires treatment or is no longer dangerous to society, due process demands his release.

▮ We see no conflict between *Jones* and the discharge statute. The standards for provisional discharge in the statute reflect the constitutional standard by requiring consideration of the need for inpatient treatment and reasonable protection of the public. These are related to the patient's continuing illness and dangerousness. Nothing in *Jones* makes *Johnson* constitutionally superior to the provisional discharge statute. We hold that the panel was correct in applying the statute instead of *Johnson v. Noot*.

2. Petitioner argues that the evidence as a whole does not support the denial of discharge. The panel denied discharge

---

**1.** In any case, the panel did make the finding that petitioner lacks the ability to control his behavior, which is the criterion for a determination of mental illness under *Johnson*. Therefore, even under prior discharge standards, the panel's decision would be upheld.

based on its findings that petitioner had not proved that he no longer needed inpatient treatment and that he had not proved that his proposed discharge plan would provide a reasonable degree of protection to the public. The panel also found that there was less likelihood of sexual behavior by petitioner under the partial hospitalization program than under the provisional discharge plan, that the public safety would be better protected by his continued hospitalization, and that petitioner had never undergone serious treatment, leaving little, if any, reason to believe that he was less dangerous than he was in 1976 or 1969. Petitioner contends that these findings are clearly erroneous.

■ On review, this court "is not to weigh the evidence as if trying the matter *de novo,* but to determine from an examination of the record if the evidence as a whole sustains the appeal panels' findings. If it does so, it is immaterial that the record might also provide a reasonable basis for inferences and findings to the contrary." *Johnson v. Noot,* 323 N.W.2d 724, 728 (1982). We believe the evidence as a whole supports the panel's findings that Mr. Enebak is still in need of inpatient treatment and that the public will not be reasonably protected if he is discharged into the community.

### A. Need for Inpatient Treatment

■ The evidence in the record indicates that petitioner has never undergone serious treatment for his sexual deviancy despite his numerous and lengthy commitments at the Security Hospital. He has completed a sex education program. However, this program was educational and not therapeutic and, therefore, is not regarded as effective treatment for sexual disorders like petitioner's.

Petitioner also saw a psychologist and a social worker at the Dakota County Mental Health Center approximately two times per month while on the partial hospitalization program. The sessions with the psychologist mostly involved testing and counseling. They touched very little on petitioner's past sexual behavior. The sessions with the social worker were largely devoted to reviewing the log of petitioner's activities which he prepared while on home passes.

Petitioner had sessions with a psychiatrist from the Center for Behavior Modification at Fairview-St. Mary's Hospital. These sessions were spent collecting information concerning petitioner's past sexual history and evaluating him on the basis of that information. Very little time, if any, was spent on treatment or therapy. Petitioner testified that he has had between 150 and 200 hours of group therapy concerning sexual attitudes in the Security Hospital. The sex education class, the group therapy, and the outpatient counseling sessions comprise the only treatment petitioner has received for his sexual problems in the 30 years since his initial commitment.

Although the Security Hospital does have a successful treatment program (ITP-SA) for non-mentally ill sex offenders, petitioner has never been considered a good candidate for that program because of his continued denial of his sexual problems. As noted in a June 1983 psychological report,

Mr. Enebak continues to minimize the seriousness of his sexual misconduct, and he denies that he has problems in the area of his sexuality at the present time. He attempts to present a facade of morality, religiosity and suitability for release to the open community. Nevertheless, Mr. Enebak does not appear to be an appropriate candidate for any of the treatment programs available to him at the Minnesota Security Hospital with the exception of the Intensive Treatment Program for Sexual Aggressives (ITP-SA). He has not, and says that he will not, accept treatment in that Program.

Petitioner's testimony at the discharge hearing indicates his avoidance of his problems. He testified that he believes that his sexual problems are behind him because of his renewed commitment to God and to his family. He also stated that now that he is older, his sexual drives have "burned out" and that he has it "out of his system now." He claims that he no longer craves "that

kind of excitement" on his weekend visits home. Petitioner admits to making the same claims at his 1974 guilty plea, and he, nevertheless, again committed a criminal sexual assault in 1976.

The testimony in the record supports the conclusion that petitioner's perception of his problems is not a reliable basis for predicting his future behavior. The medical director of Security Hospital testified that persons with petitioner's psychiatric disorder tend to manipulate and to present themselves in the best light. A psychological report by a hospital staff psychologist in February of 1982 also gave that view: "[Mr. Enebak] seemed to wish to present himself as morally righteous and in the most favorable light. An attempt to want to cover up undesirable personal faults was noted." The report went on: "It is my impression that Mr. Enebak attempts to minimize the seriousness of his sexual problems and uses denial in trying to persuade people concerning his sincerity and readiness to re-enter the community." Minnesota Multiphasic Personality Inventory results also indicate that he minimizes his sexual problem and that he lacks personal insight and tends to present himself in the best possible light.

Evidence in the record as a whole indicated that outpatient treatment would be ineffective in dealing with petitioner's sexual problems. The medical director testified that ordinary outpatient counseling of sex offenders is not effective in changing character. He also stated that sex offenders like petitioner are deterred from inappropriate behavior only by extensive supervision and control. He did not believe that appropriate supervision in the community was available through outpatient treatment.

Other psychiatric opinions in the record confirm this view. Although there are opinions in the record indicating that petitioner is amenable to outpatient treatment, those opinions were made with considerable caution, noting the patient's continued denial of his sexual problems, his tendency to present himself in the best light, and the absolute necessity for close supervision of his activities in the open community.

The record shows the lack of any substantial treatment over the past 30 years, petitioner's continued denial and minimization of past sexual problems, his failure to control his impulses despite past protestations that he could do so, and the fact that sex offenders who go without treatment are highly recidivistic. The evidence as a whole supports the panel's determination that petitioner continues to need inpatient treatment.

B.  *The Degree of Protection to the Community Under the Proposed Discharge Plan*

■ The proposed discharge plan would be the same as the partial hospitalization program under which supervision was provided by petitioner's own reports of his activities to the police. The only difference would be that he would be away from the hospital all 7 days of the week instead of just 4. He would fill the extra 3 days with outpatient therapy and the development of his home electronics business. The panel found that this proposal did not provide a reasonable degree of protection to the public.

Petitioner argues that he has demonstrated his ability to control his conduct by his compliance with the terms of the partial hospitalization for 14 months without incident. Based on this, he contends that he can be safely released into the community. He also stresses the fact that he has not had an incident of sexual misconduct since 1976.

Despite petitioner's apparent good conduct while on pass in the period 1981–1982, the evidence as a whole supports the panel's determination that the provisional discharge plan would not provide a reasonable degree of protection to the community. It was while petitioner was on unsupervised weekend leave that he committed the assault that led to revocation of his probation in 1976. Under the plan, the only supervision of activities would be provided by the Dakota County police and petitioner's social worker at Dakota County Mental Health Center. A Dakota County police officer and the social worker both testified

that they relied on petitioner's own reports of his whereabouts and did not have the manpower to provide independent supervision. The social worker admitted that he would have to rely on petitioner's wife's reports as well. Mrs. Enebak never reported her husband's absence from the home to the police or to the Mental Health Center on the night of the 1976 sexual assault. The medical director of the Security Hospital suspects that she may play a role in facilitating her husband's behavior.

The lack of supervision and the need to rely on petitioner's unverified reports are especially troublesome in light of the testimony that persons with petitioner's disorder require a great deal of control and supervision. Although petitioner has not had a reported incident of sexual misconduct since 1976, he has never received any substantial treatment for his condition. The evidence strongly indicates that petitioner's behavior disorder will not change if untreated.

For the above reasons, we affirm the decision of the three-judge panel denying petitioner's proposed provisional discharge.