**In the Matter of the ALLEGED MENTAL ILLNESS OF: Gary CORDIE, Patient. (C7–85–676).**

**In the Matter of the ALLEGED MENTAL ILLNESS OF: Judy CORDIE, Patient (C9–85–677).**

Nos. C7–85–676, C9–85–677.

Court of Appeals of Minnesota.

July 30, 1985.

Review Denied Sept. 26, 1985.

Thomas Bennett Wilson, III, Gayle Gaumer, Edina, for appellants Gary and Judy Cordie.

Michael Kirk, Otter Tail County Atty., David J. Hauser, Asst. Otter Tail County Atty., Fergus Falls, for respondent.

Heard, considered and decided by POPOVICH, C.J., and WOZNIAK and RANDALL, JJ.

## OPINION

RANDALL, Judge.

Appellants were committed as mentally ill on July 26, 1984. In January 1985 they moved to vacate the commitment orders and for new trials, on the grounds they were deprived of competent counsel. A hearing on these motions was combined with a six-month review hearing. By order on March 13, 1985, the trial court denied the motions for new trials and continued appellants' commitments. Appellants now seek review of those orders. We affirm.

## FACTS

Appellants are husband and wife. Gary Cordie's nine-year-old daughter lived with them. Appellants refused to send the daughter to public school beginning in the fall of 1983 and began educating her at home. They also prevented her from playing with other children. In February, 1984, Gary Cordie quit his job as a mail carrier. Appellants began buying large quantities of groceries. A checkout clerk testified the Cordies spent $800 one day in late February or early March 1984, approximately $600 of which was for meat and $200 for pet food. Appellants warned the clerk the entire town would be destroyed by fire, but they would survive.

Approximately one week later, appellants returned to the same grocery store for

another $500 order, most of which was canned cat food. Appellant Judy Cordie told another clerk the town would burn and the people would "go way, way down" but appellants would be saved by God. At about the same time, appellants advertised all of their household goods for sale, then ordered more than $10,000 worth of furniture, drapes, and carpeting from local stores, but failed to pick up the merchandise.

A neglect petition concerning appellants' daughter was filed March 8, 1984, but appellants failed to respond to the petition. An order was issued on March 26, 1984 to take the child into custody. On April 1, a Fergus Falls police officer saw appellants and the child singing loudly in an inappropriate manner. They initially refused to acknowledge the officer, but he eventually made them understand he had an order to pick up their child. Judy Cordie called upon God to strike the officer dead.

After the family was taken to the Law Enforcement Center, Judy Cordie told the child blood was oozing from the officers' mouths because they were enjoying what they were doing to the Cordies, and said the family would be "taken up" by God if any attempt was made to separate them. The child protection worker who arrived to take appellants' daughter was accused by Judy Cordie of drunkenness, although a breathalyzer test confirmed she had not been drinking. Appellants continued to call upon God to strike the officers dead.

Appellants returned to their home and still would not answer the door or telephone or take in mail. They did not visit or call their daughter. When they failed to pay monthly utility bills, their electricity was shut off. On July 9, 1984, a search warrant was executed to determine whether the home violated health, safety, and building regulations. Police officers found all windows covered by drapes or newspapers. Appellants did not answer the door and entry was finally forced. The home was neat and orderly, but a strong odor of rotten food was present. Large amounts of rotted meat and other food were found

in a refrigerator and a freezer. Appellants were discovered in an upstairs bedroom. Judy Cordie tried to prevent her husband from speaking with the officers conducting the search. Appellants continued to chant and pray while the search was conducted. All officers were again cursed to be bound up or struck dead. The building inspector concluded appellants' home was uninhabitable because of the lack of electricity and hot water and the large amount of rotten food.

The police chief returned the next day to check on appellants' welfare and assured them the city would repair the door through which entry had been gained. After five minutes of conversation, Judy Cordie told the chief a "wall had come down" and, as far as she was concerned, he no longer existed. Later that day police officers discovered a large quantity of valuable household items and electronic equipment lying in the yard outside appellants' house, which items they took into custody to prevent theft.

Commitment petitions were filed on July 13, 1984, and appellants were taken into custody pursuant to a 72-hour apprehend and hold order. The hold order was continued after a hearing on July 18, 1984.

Psychiatrist Carl Nelson examined appellants on July 20 and 21 and testified at the July 26, 1984, commitment hearing. Appellants were unwilling to complete any psychological testing and their version of events leading up to the commitment hearing differed sharply from the testimony of police officers. They agreed they isolated themselves after their daughter was removed, that they allowed the electricity to be shut off and that they called upon angels to be sent against their enemies.

Nelson testified the condition of the home presented a threat to appellants' health and safety, that they were delusional, mentally ill and in need of commitment. He told the court appellants were afraid to leave their home, their reaction to removal of Cordie's daughter was extreme, and they were not in touch with reality. Appellants continued to speak to Nelson of their

concern that the citizens of Fergus Falls were involved in witchcraft.

The trial court found appellants were mentally ill, that no alternative to commitment existed, and that hospitalization was needed. The court committed both appellants to Fergus Falls State Hospital for six months. Upon admission to the hospital Judy Cordie was diagnosed as suffering from chronic paranoid schizophrenia and Gary Cordie was diagnosed as suffering from a shared paranoid disorder. The commitments were reviewed in November 1984 and appellants were provisionally discharged from the state hospital on November 27, 1984.

Appellants moved to vacate the orders of commitment and for new trials in January 1985. Those motions were heard when the trial court conducted its six-month review hearing on January 30, 1985. On March 13, 1985 the court denied the motions for new trials, found appellants remained mentally ill, and continued their commitments, while acknowledging they had been provisionally discharged since November 1984. Both appellants were then fully discharged on March 19, 1985.

By notice of appeal filed April 12, 1985, appellants seek review of the March 13 orders, arguing they should have been granted new trials and their commitments should not have been continued.

## ISSUES

1. Are these appeals, from orders denying new trials and continuing appellants' commitment, moot because appellants have now been fully discharged from commitment?

2. Did the trial court err by denying appellants' motions to vacate the commitment orders and hold new trials?

3. Were the commitments properly continued at the six-month review hearing?

## ANALYSIS

■ 1. Since appellants have been discharged from their commitment, we must first determine whether the entire appeal is moot. *See In Re Ringland,* 357 N.W.2d 132 (Minn.Ct.App.1984). Appellants argue they were deprived of effective counsel, an issue which is capable of repetition yet evading review. If persons subject to commitment proceedings are inadequately represented, procedural irregularities may occur without objection and necessary appeals may not be taken. We decline to dismiss the appeals as moot and will address the merits. *See In Re Peterson,* 360 N.W.2d 333 (Minn.1985).

■ 2. On appeal from an order denying a motion for a new trial, we will review only errors presented to the trial court in the motion. *Alholm v. Wilt,* 348 N.W.2d 106 (Minn.Ct.App.1984). Appellants sought to vacate their commitment orders and obtain new trials solely on the basis of inadequate counsel. At oral argument before this court, all parties agreed the sole basis for appeal is the claim of inadequate counsel.

■ A party may move for relief from a final judgment or order within any reasonable time. Minn.R.Civ.P. 60.02. However, a motion for a new trial must be made within 15 days after service of notice of filing the decision. Minn.R.Civ.P. 59.03. No affidavit of service in the trial court file indicates when the July 26, 1984, commitment orders were served on appellants, but the trial court denied their motions for new trials as untimely in its March 13, 1985, order.

■ Persons subject to commitment proceedings have the right to counsel who shall act as a vigorous advocate on their behalf. Minn.Stat. § 253B.03, subd. 9 (1984). Although commitment proceedings are civil in nature, they may result in the loss of liberty and an analogy to the standard employed in criminal cases to evaluate the adequacy of counsel is appropriate. Counsel is inadequate if he or she fails to exercise the diligence of a reasonably competent attorney under similar circumstances. *Sather v. State,* 352 N.W.2d 79, 81 (Minn.Ct.App.1984). We note appellants offered no expert testimony on the compe-

tency of trial counsel. Even if counsel's representation is less than perfect, the result of a hearing or trial will be set aside only if counsel's actions so undermine the hearing process that the result is prejudiced. *See Strickland v. Washington,* ⸺ U.S. ⸺, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The commitment orders themselves are not subject to review here and our analysis is restricted to the performance of counsel. Appellants argue there were numerous procedural errors to which counsel did not object.

■ Prior to filing a petition for commitment, a screening team must prepare a prepetition report of its investigation concerning the proposed patient. Minn.Stat. § 253B.07, subd. 1. The team must interview the proposed patient and others knowledgeable about the patient's condition. If the patient is not interviewed, the reasons must be documented in the report. The team must identify the conduct upon which the commitment application is based and explore alternatives to commitment, and it may recommend commitment. "Social and medical history reports" prepared on appellants in this case explained that interviews were not conducted and alternatives to commitment could not be explored since appellants isolated themselves and refused all attempts at contact. These reports were sufficient and counsel properly failed to object to them.

■ Appellants argue their counsel should have objected to the petitions filed July 13, 1984. Each petition must set forth (1) the name and address of the proposed patient, (2) the name and address of the proposed patient's nearest relatives, and (3) the reasons for the petition. Minn.Stat. § 253B.07, subd. 2. The petition must contain factual descriptions of recent behavior supported by the observations of named witnesses. The petitions in this case contained more than two pages of detailed factual allegations, and many witnesses were identified. The petitions complied with the statute and counsel did not err by failing to object.

■ The petitions were not accompanied by a written examiner's statement because appellants had refused all efforts at contact. While an examiner's statement must ordinarily accompany a petition, the absence of a statement is not determinative if the petition documents that reasonable efforts were made to secure the statement. *Id.* The reason no examiner's statement was submitted with the petition is self-evident in this case and appellants were not prejudiced by counsel's failure to object.

■ Proposed patients may be held for up to 72 hours if the petitioner shows "that serious imminent physical harm to the proposed patient or others is likely unless the proposed patient is apprehended[.]" Minn. Stat. § 253B.07, subd. 6. The statute does not require the trial court to make a finding of imminent harm, but focuses on the showing which must be made by petitioner. The record before the trial court on July 13, 1984, included reports that appellants were living without electricity or hot water, in a house which violated the building code, and with a large quantity of spoiled food. Appellants had recently discarded many valuable possessions on their lawn and cut off all contact with others, including their daughter. The record supported a conclusion that it was necessary to hold appellants to prevent imminent physical harm and appellants were not prejudiced by counsel's failure to object to the apprehend and hold orders.

■ A hearing on any apprehend and hold order must be held within 72 hours, exclusive of Saturdays, Sundays, and legal holidays. Minn.Stat. § 253B.07, subd. 7. The time in which to hold a hearing may be extended under certain circumstances. *See State ex rel. Doe v. Madonna,* 295 N.W.2d 356 (Minn.1980). The trial court may order a continued hold of the proposed patients "if it finds, by a preponderance of the evidence, that serious imminent physical harm to the patient or others is likely if the proposed patient is not confined." *Id.* Physical harm includes the failure to provide necessary shelter. Minn.Stat.

§ 253B.02, subd. 13. The trial court here expressed its willingness to release appellants if they had somewhere to live while awaiting their commitment hearing, but appellants agreed to return to the hospital. The hearing in this case began *72 hours and 43 minutes* after appellants were apprehended. Appellants can hardly claim prejudice since the preceding court case, which ran long, was the completion of a hearing on the juvenile petition involving appellants' daughter. We see no prejudice to appellants from the 43 minute delay in this case or from counsel's failure to object. Appellants did not attempt any showing of actual prejudice by the slight delay, and none can be found.

■ Appellants further argue counsel should have objected to the examiner's report, which was filed less than 48 hours before the commitment hearing. *See* Minn. Stat. § 253B.07, subd. 5. We note the statute specifically authorizes counsel to agree to a later filing and appellants have shown no prejudice from the delay. We have reviewed the examiner's report, which recites appellants' response to the petition allegations, concludes they suffer from a thought disorder, and states their mental illness poses a threat of harm due to failure to provide for themselves. *See* Minn.Stat. § 253B.02, subd. 13. The report complied with the statute and appellants were not prejudiced by counsel's failure to object.

■ Appellants argue counsel should have appealed the commitment orders. If a trial court finds, by clear and convincing evidence, that the proposed patient is mentally ill and concludes there is no suitable alternative to commitment, it must commit to the least restrictive treatment facility available. Minn.Stat. § 253B.09, subd. 1. The trial court must make findings of fact and state the conduct which forms the basis for determining that each statutory requisite was met. *Id.*, subd. 2. The trial court here merely found appellants were mentally ill, without specifying the conduct upon which it relied. More detailed findings were made on the lack of suitable alternatives to commitment. We note

again that this is not an appeal from the commitment orders themselves, but rather an examination of whether counsel's failure to appeal prejudiced appellants. We find it did not. At best, an appeal might have resulted in a remand for further findings. Even that possibility is speculative since the record disclosed sufficient evidence to support commitment. *See In Re Stewart,* 352 N.W.2d 811 (Minn.Ct.App. 1984).

■ Appellants raised additional arguments which we reject including: failure to appoint counsel when the petitions were filed, Minn.Stat. § 253B.03, subd. 9 (we note appellants were not taken into custody until after the petitions were filed and they were represented by counsel at the preliminary hearing); failure to timely serve the petition, order for examination, summons and other papers, Minn.Stat. § 253B.07, subd. 4 (this subdivision contains no time limit for service and appellants were obviously familiar with the petition allegations when they testified at the preliminary hearing); and the trial court's failure to inform them of the right to a second examiner, Minn.Stat. § 253B.07, subd. 3 (appellants' former counsel did not testify at the motion to vacate the commitment orders, so we are unable to say whether they informed their clients of the right to a second examiner, but even now, appellants do not claim they would have requested a second examiner had they been aware of its availability).

■ The Commitment Act carefully specifies the procedures that must be followed before any person can be found mentally ill and deprived of their liberty. We do not countenance violations of the Act or its procedural safeguards, but the tactical decisions of counsel to waive possible objections to matters which did not result in prejudice to their client are an insufficient basis upon which to vacate commitment orders. We hold the trial court did not err in refusing to vacate the commitment orders for lack of adequate counsel.

3. Appellant Gary Cordie argues the trial court should have discharged him on

October 26, 1984, for failure of the state hospital to timely file a 90-day report. No more than 90 days after the initial commitment, the treating facility must file a report focusing on the patient's diagnosis, treatment, and prognosis. Minn.Stat. § 253B.09, subd. 5. The 90 days expired Wednesday, October 24, 1984, and the report on Gary Cordie was not filed until Friday, October 26.

 Counsel argued Gary Cordie should be discharged, but the trial court concluded appellant was not substantially prejudiced by the delay. The report stated it was anticipated Gary Cordie would be discharged one month later. We again note this appeal was not taken from the October, 1984, order refusing to discharge Gary Cordie, but from the March, 1985, order denying relief for inadequate counsel. On these facts, we agree appellant was not prejudiced by the two-day delay and counsel's failure to appeal the adverse ruling does not compel vacation of appellant's commitment.

4. Appellants argue the trial court should not have continued their commitments after the six-month review hearing held on January 30, 1985. After the initial six-month commitment, the trial court may continue commitments for up to 12 months if it finds, by clear and convincing evidence, the patient continues to be mentally ill, involuntary commitment is necessary to protect the patient or others, and there is no alternative to involuntary commitment. Minn.Stat. §§ 253B.12, subd. 4 and 253B.13, subd. 1. The trial court found appellants remained mentally ill and commitment was necessary to insure continued out-patient treatment, without which appellants could again pose a threat of harm to themselves, as they had in July, 1984. These findings are not clearly erroneous and will not be disturbed on appeal. *See* Minn.R.Civ.P. 52.01. The court erred however, in committing for an *indeterminate* term, since the statute allows commitment to be continued for the probable length of time necessary, or for 12 months, *whichever is less.* Minn.Stat. § 253B.13,

subd. 1. Appellants were provisionally discharged on November 27, 1984, when they left the state hospital, and fully discharged from their commitment on March 29, 1985, so modification of the term of continued commitment is not necessary in this case.

## DECISION

Appellants were not entitled to new trials or relief from the July, 1984, commitment orders due to allegations of inadequate counsel. The trial court properly continued appellants' commitment, but should have limited the term of the continued commitment to the probable length of time necessary for treatment, not to exceed 12 months.

Affirmed.