**In re Weston George DIBLEY, Mentally Ill and Dangerous.**

No. C6–86–1960.

Court of Appeals of Minnesota.

Feb. 3, 1987.

Review Denied March 25, 1987.

Michael J. McCartney, Breckenridge, for appellant.

Timothy E.J. Fox, Wilkin Co. Atty., Breckenridge, for respondent.

Heard, considered and decided by POPOVICH, C.J., and PARKER and LESLIE, JJ.

## OPINION

LESLIE, Judge.

Dibley seeks review of a September 11 commitment order finding him to be mentally ill and dangerous, an October 7 order denying his motion for new trial, and an October 22 order committing him for an indeterminate period and finding that he remains mentally ill and dangerous. Dibley complains of ineffective assistance of

counsel at the initial hearing on the petition, improper admission of the opinions of the court appointed examiner, who Dibley claims was not qualified, and insufficient evidence to support the findings of the trial court. We affirm the trial court.

## FACTS

Weston Dibley has a history of violent behavior. In 1976 he barricaded a road near his family farm, armed himself with dynamite, and threatened to blow up the road to improve the drainage from the farm. Dibley's father died in 1979 and Jay Nord bought the farm with his brother. Jay's father Wallace Nord had known the Dibley family since Weston was born. After the Nords bought the Dibley farm Weston Dibley became convinced the purchase price was the result of collusion. He confronted Wallace Nord with a loaded sawed-off shotgun, threatened to kill him, and was convicted of assault. Dibley claimed he went to the farm for the purpose of making a citizen's arrest of Nord. Dibley was sentenced to prison as a result of the conviction.

In 1983 Dibley began driving by the Nord farm repeatedly at all hours of the day and night, "revving" the engines of his motorcycle and truck, and sometimes sat watching the house for long periods. On one occasion he shone a search light at the house in the middle of the night for 15 minutes.

Also in 1983, Dibley was involved in a serious incident involving Minnesota and Wisconsin police. Highway patrol officers attempted to stop Dibley's truck, which was driving recklessly. Dibley fled at high speed, crashed through barricades, and repeatedly attempted to back over officers who succeeded in briefly pulling him over. Dibley later explained the incident by saying he was in a hurry to return to Fargo. He was finally stopped when officers repeatedly shot the radiator and windshield of his truck.

In December 1984 Dibley drove to the Nord farm twice in one day. The following day, Jay Nord discovered that a pickup truck parked in a shed on the farm had been set afire. Dibley pleaded guilty to burglary for this incident.

In early 1985, while Dibley was in jail, he started a fire. At about the same time, Dibley spoke with an investigator about the 1979 shotgun assault on Wallace Nord. He claimed Nord had repeatedly urged him to pull the trigger and he still had no idea why he had not killed Nord.

Dibley was repeatedly stopped for speeding and his truck was finally impounded. When he was released from jail, Dibley stole a truck to drive home.

In July 1985 Dibley was being held in the Clay County jail, serving the sentence imposed for the 1983 fleeing of police officers. He was involved in fights with other inmates and refused to wear clothing. Dibley was released from jail in December 1985. As a condition of his probation, he was required to have no contact with the Nord family.

In early April 1986 Dibley contracted with newspapers for printing and advertising in the name of a person he knew to be dead. On April 30, 1986 Dibley saw his probation officer, Richard Crawford. Dibley was very agitated and upset with the Nords, apparently due to an insurance claim for damage to their pickup truck. At 2:00 a.m. on May 1 a brick was thrown through a living room window at the home of Jay Nord. Seconds later a metal trailer hitch was thrown through another window. The Nord baby normally slept near one of the broken windows, but was in another room at the time. At about 4:30 that morning, Dibley was arrested for driving after suspension in nearby Fargo. He was released by authorities.

Dibley's probation officer learned of the incidents and obtained an order to hold Dibley for a hearing on whether the driving offense constituted a violation of his probation. Dibley was eventually arrested at a cemetery near the Nord home. While in jail Dibley refused to wear clothing, screamed continuously, and broke his breakfast tray into pieces against the wall

of his cell. He was transferred to another facility and "carried on" during the four hour drive, threatening at least twice to kill his probation officer and others.

Dibley was admitted to the Minnesota Security Hospital on May 6 for observation and evaluation and he remained there until July 19. The security hospital diagnosed Dibley as mentally ill, but competent to face the pending criminal charges. A petition for commitment as a mentally ill and dangerous person was filed by the Wilkin County Sheriff on July 25.

Dibley was examined by psychologist Richard Ascano on August 1. Ascano submitted a report to the trial court on August 6 describing his examination and diagnosis. Dibley admitted his unusual jail behavior to Ascano, although he claimed he took off his clothes only because he was hot. Dibley described the 1979 shotgun assault, the 1983 fleeing of police officers, and his 1985 theft of a vehicle after release from jail. He denied setting fire to the Nord pickup, but admitted entering the building in which the truck was parked. Dibley explained the placement of advertising in the name of another as an attempt to dedicate a new business in that person's memory. He admitted threatening to kill Crawford, but claimed he did not mean it.

Dr. Ascano diagnosed Dibley as suffering from a manic-depressive illness (also called a bipolar affective disorder) characterized by sudden changes of mood and a strong likelihood of future recurrence. Ascano noted that Dibley lacks the ability to control his explosive behavior when in the manic state of the illness. Ascano's report explained the most important factor in predicting future dangerousness is prior criminal conduct.

When Ascano testified at the initial hearing on September 11 Dibley's counsel moved to dismiss, arguing that Ascano did not meet the statutory definition of an examiner. The trial court ruled that Ascano was qualified. Ascano testified he concluded Dibley poses a threat to those with whom he has had prior problems and he cannot control his behavior unless treated.

Ascano recommended in-patient treatment with medications.

Probation officer Richard Crawford testified, summarizing Dibley's history of criminal activity and unusual behavior in jail. (Crawford had personally observed Dibley's behavior in jail.)

Crawford remained very concerned about potential harm to the Nords, based on Dibley's longstanding harassment of them. When Dibley was very agitated at his April 30 meeting with Crawford, Crawford telephoned the Nords to warn them of his concern. Crawford also testified he feared Dibley could be hurt because the Nords "could not take anymore." Crawford immediately suspected Dibley when he learned of the brick throwing incident at the Nords' and thought the traffic arrest about two hours later made it even more likely Dibley was involved. In light of Dibley's past behavior, Crawford testified he took Dibley's threats to kill him seriously.

The guardian ad litem joined in the recommendation Dibley be committed to the security hospital as a mentally ill and dangerous person. Dibley's counsel argued there was no proof Dibley would be dangerous in the future and only limited proof he had long before actually attempted to cause physical harm in the past. The trial court found Dibley to be a mentally ill and dangerous person and committed him to the security hospital.

Dibley obtained substitute counsel and sought a new trial. That motion was denied on October 7. The trial court rejected Dibley's claim that he was denied a fair hearing due to ineffective assistance of counsel. The court noted the evidence supported the finding of dangerousness, including the 1979 shotgun assault on Wallace Nord, as well as the pickup fire, violent behavior in jail, and threats to kill his probation officer which were listed in the initial order for commitment. The court again found that licensed consulting psychologist Richard Ascano was a qualified examiner, mentioning his work as clinical

director of a mental health center and with private patients.

Dibley's commitment was reviewed by a second trial court on October 21. In addition to the findings in the initial commitment order and the order denying a new trial, the October 7 report from Minnesota Security Hospital, and the file, the court had before it the report of clinical psychologist Richard Helgeson, an examiner appointed at Dibley's request.

Helgeson concluded Dibley remained mentally ill and dangerous. He recommended hospitalization and reported that "no less restrictive alternative such as community-based care is even remotely appropriate for this man who has adequately demonstrated his danger to others." Helgeson testified the mental illness from which Dibley suffers includes occasional periods of controlled behavior, but that violent uncontrolled behavior will recur unless Dibley obtains therapy and medication. Although Dibley's symptoms were in temporary remission at the time of the review hearing, Helgeson testified Dibley's past conduct indicated the symptoms will just recur in time and Dibley will again act out against the Nords.

Psychologist Douglas Fox prepared the security hospital report on Dibley. The report indicated Dibley remained mentally ill and dangerous. Fox testified Dibley has not cooperated with treatment efforts and his mental illness will likely be manifested again in the future. Fox explained that a five to eight month period without symptoms is not unusual for persons suffering from bipolar disorders.

Dibley testified he is not mentally ill, he has never harmed anyone, and he has no feelings whatsoever toward the Nords. On October 22 the trial court found Dibley continued to be mentally ill and dangerous and committed him for an indeterminate period. This appeal followed.

## ISSUES

1. Was Dibley denied effective assistance of counsel?

2. Did the trial court err by admitting the testimony of examiner Ascano?

3. Are the orders for initial commitment and continued commitment supported by the evidence?

## ANALYSIS

### I.

■ Dibley argues his counsel at the initial commitment hearing was inadequate. Proposed patients facing commitment have the right to be represented by counsel. Minn.Stat. § 253B.03, subd. 9 (1986). Counsel must act as a vigorous advocate. Minn.R.Civ. Commitment 4.01. Counsel may, unless the proposed patient opposes it, present evidence of less restrictive alternatives. Minn.R.Civ. Commitment 4.05. The instructions of the proposed patient to counsel regarding the appropriate dispositions, whether to attend hearings or testify on their own behalf, and whether to consent to continuances are binding. Minn.R. Civ. Commitment 4.06. All other trial decisions, including the selection and examination of witnesses, and the making of motions are "the exclusive province of counsel [to make] after consultation with [the proposed patient]." Minn.R.Civ. Commitment 4.07.

■ This court has previously adopted, by analogy, the standard applied to criminal cases for evaluating the adequacy of counsel in commitment cases. *In re Cordie*, 372 N.W.2d 24, 28 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Sept. 26, 1985). Representation is inadequate if counsel fails to exercise the diligence of a reasonably competent attorney under similar circumstances. *Sather v. State*, 352 N.W.2d 79, 81 (Minn.Ct.App.1984) *pet. for rev. denied* (Minn. Nov. 8, 1984).

■ The record does not include any expert testimony on the performance of Dibley's initial counsel. This court may reverse the commitment orders only if counsel's actions so undermined the hearing as to prejudice the result. *Id.* Dibley claims counsel failed to object to leading questions, narrative answers, hearsay, and rele-

vancy. We are forced to speculate, without any evidentiary support, on what rulings the trial court, sitting without a jury, might have made on these objections. Dibley also cites his attorney's failure to call witnesses to challenge the medical evidence. However, the selection of witnesses and the conduct of trial are specifically for counsel to determine. Dibley failed to identify what, if any, evidence should have been produced by his counsel. In fact, when Dibley's substitute counsel requested a second examiner at the time of the review hearing, the examiner fully concurred with the prior diagnoses and recommendations.

■ We believe Dibley's trial counsel could have been a more vigorous advocate. However, Dibley failed to establish that any action of his initial counsel prejudiced the result of the commitment hearing. We affirm the trial court's denial of Dibley's motion for new trial on this ground, and decline to disturb the initial commitment order on this basis.

## II.

Dibley next argues the commitment petition should have been dismissed, or the testimony of examiner Ascano stricken from the record, because Ascano did not meet the statutory definition of an examiner.

"Examiner" means a licensed physician or a licensed consulting psychologist, knowledgeable, trained and practicing in the diagnosis and treatment of the alleged impairment.

Minn.Stat. § 253B.02, subd. 7 (1986).

Ascano testified he has two master's degrees, a doctorate, and post-doctorate training in forensic psychology. He is the director of the out-patient adult psychotherapy program at Lakeland Mental Health Center, which serves five counties, and he previously served as director of mental health services for St. Francis Medical Center, chief of psychology services for the Air Force, and clinical director for a community mental health center in San Francisco. He

has also previously served as a court appointed examiner.

As a licensed psychologist, Ascano cannot prescribe medications, which must be monitored by a medical doctor or psychiatrist. Dibley's original counsel moved to dismiss the petition on the ground that Ascano is therefore unqualified. The trial court properly denied that motion. The statute explicitly recognizes that licensed consulting psychologists may serve as court appointed examiners, and it does not limit appointment to psychiatrists.

■ Objections to an examiner on grounds of inadequate experience treating patients similar to the proposed patient are "more pertinent to the weight to be afforded the testimony than to its admissibility." *In re Harhut*, 367 N.W.2d 628, 632 (Minn. Ct.App.1985), *pet. for rev. denied* (Minn. June 27, 1985). We are not convinced the trial court abused its discretion in concluding that Ascano, a licensed consulting psychologist with extensive experience in treating mental illness, was qualified to testify as an examiner.

## III.

Dibley argues the trial court erred in finding he was mentally ill and dangerous in September and continued to be mentally ill and dangerous in late October. He does not appear to dispute the findings of mental illness, but focuses on the issue of dangerousness.

If the trial court finds, "by clear and convincing evidence, that [a] proposed patient is mentally ill and dangerous to the public, it shall commit the person to the Minnesota Security Hospital[.]" Minn.Stat. § 253B.18, subd. 1 (1986). Dangerousness must be demonstrated by past conduct "causing or attempting to cause serious physical harm to another" and by a "substantial likelihood that the person will engage in acts capable of inflicting serious physical harm on another." Minn.Stat. § 253B.02, subd. 17 (1986). If, after the initial commitment period, the preparation of a report by the security hospital, and a hearing, the trial court finds "the patient

continues to be mentally ill and dangerous, then the court shall order commitment of the proposed patient for an indeterminate period of time." Minn.Stat. § 253B.18, subd. 3 (1986).

The findings of the trial court on dangerousness, as on other factual issues, will not be set aside unless clearly erroneous. Minn.R.Civ.P. 52.01. Dibley admitted several incidents of violent behavior to examiners Ascano and Helgeson. The Nords testified as to Dibley's ongoing harassment of them. Dibley's probation officer summarized the pattern of violent behavior.

Periodically, Dibley's symptoms are in remission and are not manifested, but the experts testified the violent behavior and other signs of mental illness will inevitably recur. The fact "that a patient may become symptom-free during hospitalization" does not compel a discharge from commitment. *In re Malm*, 375 N.W.2d 888, 891 (Minn.Ct.App.1985). In light of Dibley's continued denial that he is mentally ill or in need of treatment, and the overwhelming evidence that he has attempted to harm others in the past and is likely to endanger others in the future, we affirm the trial court's finding of dangerousness.

### DECISION

The decisions of the trial court committing Dibley as a mentally ill and dangerous person, continuing that commitment, and denying a new trial are affirmed.

Affirmed.